ARTHUR ALTSCHULER & another, trustees, vs. BOSTON
RENT BOARD & others.[1]

Suffolk.    February 12, 1981. — September 22, 1981.

Present: GRANT, BROWN, & GREANEY, JJ.

*Rent Control. Landlord and Tenant,* Habitability, Safety requirements.
*Practice, Civil,* Appeal. *Administrative Law,* Agency's authority,
Regulation. *Statute,* Construction. *Municipal Corporations,* Rent
control.

The incorporation in the State Building Code of the requirement in G. L.
c. 143, § 3R, that the main common entry door of certain apartment
buildings be equipped to close and lock automatically was sufficient to
bring the statutory requirement within the scope of the implied war-
ranty of habitability. [456-457]

General Laws c. 143, § 3R, which requires that the main common entry
door of certain apartment buildings be equipped to close and lock
automatically was a law "governing conditions of habitability" within
the meaning of a regulation promulgated by the Boston Rent Board
even though violation of the statute would not necessarily render a
building uninhabitable. [457-458]

A regulation of the Boston Rent Board conditioning rent increases on
compliance with the laws governing conditions of habitability was
within the board's authority to promulgate under St. 1969, c. 797, as
amended by St. 1970, c. 863, which provides that the board, in mak-
ing general adjustments to rents, may give due consideration to
"substantial deterioration of the housing accommodations, other than
ordinary wear and tear, or failure to perform ordinary repair, replace-
ment or maintenance." [460-465]

A regulation of the Boston Rent Board did not abrogate a landlord's right
under St. 1970, c. 863, § 2, to a fair net operating income by permit-
ting the board to deny the entire amount of a general rent adjustment
on account of the landlord's noncompliance with the laws governing
conditions of habitability. [465-468]

---

[1] Tenants of Sargent-Towne Estates.

CIVIL ACTIONS commenced in the Housing Court of the City of Boston on July 22, 1977, and March 31, 1978, respectively.

The cases were heard by *Daher*, C.J., on motions for summary judgment.

*John H. Henn* (*Sheldon M. Drucker* with him) for the plaintiffs.

*Russell Fanara* for Boston Rent Board.

*Edward Rabinovitz* (*R. Brooks Sherman* with him) for the tenants of Sargent-Towne Estates.

BROWN, J. The trustees of Sargent-Towne Estates Trust (landlord) brought these actions to review orders of the Boston Rent Board (board) which denied general adjustments in the maximum rents for 352 controlled apartments owned by the landlord. The Boston Housing Court affirmed the orders of the board. We affirm the judgments of the Housing Court.

Sargent-Towne Estates is an apartment complex in Brighton which consists of eighty-eight small buildings containing four units each. In August and September, 1976, the Boston building department issued citations which notified the landlord that the main common entry doors of all buildings were not equipped to "close and lock automatically," in violation of G. L. c. 143, § 3R.[2] On October 8, 1976, the landlord appealed these citations to the State Building Code Appeals Board (Appeals Board) on the ground that G. L. c. 143, § 3R, did not apply to these

---

[2] General Laws c. 143, § 3R, inserted by St. 1965, c. 464, § 1, and as amended through St. 1974, c. 541, § 13, provides in pertinent part as follows: "At least one of the doors of the main common entryway into every apartment house having more than three apartments shall be so designed or equipped as to close and lock automatically with a lock, including a lock with an electrically-operated striker mechanism, a self-closing door and associated equipment, and such lock, door or equipment shall be of a type approved by the state building code commission . . . . provided, however, that the said commission may, in writing, waive . . . [this] requirement . . . in appropriate cases in which, in its opinion, other security measures are in force which adequately protect the residents of such apartment house."

buildings because they were constructed before its effective date. However, this appeal was withdrawn on November 12, 1976, for reasons not stated in the record.

On November 24, 1976, the board ordered a general adjustment increasing maximum rents for all controlled units, and on December 16, 1976, the board promulgated Regulation 11 to implement that order. "Regulation 11" provided that the adjustment would be effective January 1, 1977 (§ 12[D]), but that landlords would hold in escrow the amount of rents attributable to the increase until February 28, 1977 (§ 3[C]). It further provided that the adjustment would be "subject to the . . . condition" that "[a]s of January 1, 1977, the building . . . shall comply with all laws governing conditions of habitability" (§ 5[A][3]), and that, if this condition were not met, "the landlord shall not be entitled" to the adjustment (§ 5[B][1]) and that the board could order the landlord to refund to tenants any increase already collected (§§ 5[B][2], 6[A][1][b]).

On January 18, 1977, tenants of Sargent-Towne Estates filed an affidavit opposing the adjustment, see § 6(A)(1)(a), on the ground that the buildings were in violation of G. L. c. 143, § 3R. After several hearings on the matter, the board's hearing officer found that there were no locks on the main common entry doors of any of the buildings, and that the Boston building department had determined those conditions to be in violation of G. L. c. 143, § 3R. On June 23, 1977, the board ruled that the buildings were not in compliance with all laws governing habitability, as required by Regulation 11, § 5(A)(3). Since the adjustment had been conditioned on such compliance, the board ordered the increase rescinded as to all units until such time as the landlord remedied the violations and obtained a certificate of compliance under § 9 of Regulation 11. In addition, the board ordered the landlord to refund to tenants the amounts held in escrow for the increase. At the request of the landlord, however, the board stayed its orders pending a decision by the Appeals Board on a renewed appeal which the landlord had filed on May 17, 1977.

The Appeals Board held a public hearing on the issues raised by the landlord and thereafter obtained an opinion from the Attorney General regarding the applicability of G. L. c. 143, § 3R. On February 15, 1978, the Appeals Board adopted that opinion and ruled that the statute applies to all buildings containing the requisite number of apartments, including those constructed prior to its effective date. The Appeals Board also ruled that the statute does not require electric striker mechanisms on main common entry doors but requires only that such doors close and lock automatically.[3] However, due to difficulties presented by the "unique configuration" of these buildings, the Appeals Board granted a waiver of this requirement, as permitted by the statute, on the condition that the landlord install specified alternative systems which the Appeals Board found adequate to protect the tenants.

Following this decision, the landlord requested the board to vacate its prior order denying the general adjustment. After hearing, the board's hearing officer found that the landlord had installed neither locks nor any of the systems required as a condition of the Appeal Board's waiver. The hearing officer also construed the waiver to be prospective only. On March 23, 1978, the board confirmed its order denying the rent increase and dissolved its prior stay of that order, thus requiring the landlord to refund the amounts already paid into escrow for the increase. The board ordered that rents be paid at the levels existing prior to the general adjustment until the landlord installed the systems required by the waiver and obtained a certificate of compliance from the board. It appears, however, that the landlord ultimately chose not to install those systems and installed locks with electric striker mechanisms instead. On June 22, 1978, after hearing and inspection, the board issued a certificate of compliance on these buildings and granted the general adjustment, effective July 1, 1978.

---

[3] The Appeals Board found that the doors at issue here "do not have locks but do have self closing devices."

On review in the Housing Court, the landlord challenged the board's denial of the adjustment for the period January 1, 1977, to July 1, 1978.[4]  The tenants moved for summary judgment, and the board supported that motion.  All three parties submitted documents and memoranda of law in support of their positions, but none of the parties submitted affidavits as permitted by Mass.R.Civ.P. 56(a), 365 Mass. 824 (1974).  Treating the motion as presenting only issues of law, the court granted summary judgment and affirmed the board's orders.  The landlord then took this appeal.

1.  The landlord's principal argument in the trial court was that G. L. c. 143, § 3R, is not a law "governing conditions of habitability" within the meaning of Regulation 11, § 5(A)(3).  In support of this argument, the landlord first points out that the statute was not incorporated in the State Sanitary Code on January 1, 1977, the operative date of the regulation.[5]  However, G. L. c. 143, § 3R, had at that time long been incorporated in the State Building Code,[6] and that is sufficient to bring it within the scope of the implied warranty of habitability.

Recent opinions of the Supreme Judicial Court have made clear that the warranty includes, as a minimum, not only the requirements of the Sanitary Code but also those of the Building Code.  *Crowell* v. *McCaffrey*, 377 Mass. 443, 451 (1979).  *Berman & Sons* v. *Jefferson*, 379 Mass. 196, 201 n.9 (1979).  See also *Boston Housing Authy.* v. *Hemingway*,

---

[4] The landlord filed one action to review the board's order of June 23, 1977, and another action following the order of March 23, 1978. The landlord moved to consolidate the two actions, and that motion was apparently allowed, although the docket does not so reflect.  In addition, the tenants were joined as defendants by order of court.

[5] At that time, the Sanitary Code was silent regarding requirements for locks.  Shortly thereafter, however, on August 1, 1977, a revised version of the code added a new section entitled "Security," which incorporated the portion of the statute relevant here.  67 Mass. Reg. 21, 34 (1977). This regulation is now codified as 105 Code Mass. Regs. § 410.480(C) (1978).

[6] See § 612.411 of the State Building Code, as filed with the State Secretary on July 1, 1974, effective January 1, 1975.  That regulation is now codified at 780 Code Mass. Regs. § 612.5.1.1 (1979).

363 Mass. 184, 207-208, 210, 218 (1973) (Quirico, J., concurring in part and dissenting in part). We therefore conclude that G. L. c. 143, § 3R, is a law "governing conditions of habitability," at least in so far as it is incorporated in the State Building Code.[7]

The landlord's next argument is based on the Housing Court's finding that "while the apartments were not rendered uninhabitable, certainly habitability was in fact affected." The landlord suggests that since the absence of the locks required by G. L. c. 143, § 3R, did not render the apartments uninhabitable, the statute is not a law "governing conditions of habitability." We disagree.

"Habitability" is a term of art, and an apartment need not be literally uninhabitable to be in violation of the implied warranty. The revised Sanitary Code, see note 5 supra, draws a distinction between a condition, which makes a unit "unfit for human habitation" (defined as a condition justifying condemnation), 105 Code Mass. Regs. § 410.022 (1978), and a condition which "may endanger or materially impair the health or safety and wellbeing of an occupant" (defined as a condition which may expose those interests to harm), 105 Code Mass. Regs. § 410.023 (1978). The latter condition is sufficient to violate the warranty of habitability. Boston Housing Authy. v. Hemingway, supra

---

[7] We therefore do not decide whether the statute standing alone would fall within the scope of the implied warranty or of Regulation 11, § 5(A)(3).

It is worth noting, however, that the implied warranty gives landlords a general obligation to maintain the premises in safe condition. See Crowell v. McCaffrey, supra at 446-448 (summarizing recent case law). See also Javins v. First Natl. Realty Corp., 428 F.2d 1071, 1074 (D.C. Cir. 1970) (requiring "secure windows and doors"). In addition, several jurisdictions have specifically held that the implied warranty creates an obligation to provide reasonable security against foreseeable criminal activity. See Trentacost v. Brussel, 82 N.J. 214, 227-228 (1980) (absence of lock on common entry door, as here, constitutes breach of implied warranty); Kline v. 1500 Massachusetts Ave. Apartments Corp., 439 F.2d 477, 485-486 (D.C. Cir. 1970) (removal of doorman and other attendants employed at inception of tenancy constitutes breach). See also Restatement (Second) of Property, Landlord & Tenant § 17.3, Comment 1, Illustrations 17 and 18, and Reporter's Note 13 (1977).

at 200 n.15 (proof that "Code violations exist which 'may endanger or materially impair . . .' would constitute evidence of a material breach . . ."). See also *id.* at 200 n.16. An apartment need not be totally uninhabitable before the implied warranty is violated. See *id.* at 202 (material breach may result in either "partial or complete" abatement of rent); *McKenna* v. *Begin,* 5 Mass. App. Ct. 304, 310-311 (1977) (adopting rule of damages based on percentage impairment of use). Thus, it is properly said that "[a] dwelling afflicted with a substantial Sanitary Code violation is not habitable," in the sense that it is not in compliance with the warranty, *Berman & Sons* v. *Jefferson, supra* at 201-202, even though the breach is not so severe as to abate the rent to zero, see *McKenna* v. *Begin, supra* at 313 (Brown, J., concurring), or force the tenant to vacate, see *Boston Housing Authy.* v. *Hemingway, supra* at 199-200.

Likewise, a statute which fixes minimum requirements for residential premises may have a direct and significant bearing on habitability even though a violation of the statute does not render the premises totally uninhabitable. Here, the Housing Court found that "certainly habitability was in fact affected" by the violations of G. L. c. 143, § 3R.[8] We cannot say that this finding is clearly erroneous.[9] Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974). *Perez* v. *Boston Housing Authy.*, 379 Mass. 703, 705 (1980).

---

[8] The landlord contends that the scope of Regulation 11, § 5(A)(3), will become indefinite and unpredictable if we construe a statute as "governing conditions of habitability" where habitability is merely "affected." Whatever the merit of this argument in another context, we think that it has no application here. We read the emphasis contained in the judge's language above as indicating a finding that habitability was, in fact, materially affected. Moreover, as discussed *supra*, the fact that the statute at issue here was incorporated in the State Building Code undercuts any argument that its bearing on habitability was indefinite in the present case.

[9] See 105 Code Mass. Regs. §§ 410.700, 410.750 (1979), inserted in compliance with St. 1973, c. 880, amending G. L. c. 111, § 127A. Although § 410.750 of the Code, see note 5, *supra*, does not include the absence of a lock on an exterior door as a condition which "shall always be deemed" a serious violation, that section emphasizes that such omission "shall in no way be construed as a determination that . . . [it] may not be found to fall within" that category. See also § 410.700.

2. The landlord's principal argument in this court is that the board lacked authority under the prevailing enabling statutes, St. 1969, c. 797, as amended by St. 1970, c. 863,[10] to condition the general adjustment on compliance with "all laws governing conditions of habitability." The landlord also makes the related argument that the board lacked authority to deny the entire amount of the adjustment because such denial conflicts with the statutory requirement that landlords receive a "fair net operating income" from controlled units. St. 1970, c. 863, § 2. The defendants maintain, however, that the landlord never raised these contentions below. The record shows that the defendants are correct. In particular, we find no mention of these arguments either in the board's summary of its proceedings or in the summary of issues set out in the Housing Court's opinion. The landlord may not raise these issues on appeal where he failed to raise them in the trial court, see *Milton* v. *Civil Serv. Commn.*, 365 Mass. 368, 379 (1974); *Royal Indem. Co.* v. *Blakely*, 372 Mass. 86, 87-88 (1977); *Drury* v. *Abdallah*, 9 Mass. App. Ct. 865, 866-867 (1980), or before the board, *Niles* v. *Boston Rent Control Admr.*, 6 Mass. App. Ct. 135, 151 (1978); *Whitehall Co., Ltd.* v. *Alcoholic Beverages Control Commn.*, 7 Mass. App. Ct. 538, 542-543 (1979).

Nevertheless, the landlord contends that those issues are "in substance the same" as those raised below ("albeit through expanded and somewhat differently formulated arguments") and points to four isolated phrases in the amended complaint as support for this contention. However, even if we construed the amended complaint as raising the issues now argued, the landlord not only failed to pursue those arguments but, in fact, took a contrary position in its

---

[10] During the period when the Statewide enabling act was in effect, Boston conducted rent control pursuant to the authority of that act. St. 1970, c. 842. Since the expiration of that act on April 1, 1976, rent control has continued in Boston under the authority of the original enabling statute for that city.

memorandum in opposition to summary judgment.[11] Moreover, the Housing Court specifically noted, in passing, that the "[p]laintiff does not in fact contest the validity of Regulation 11."

Ordinarily, the conclusion we reach above would end our analysis. We note, however, that the issues raised here present only questions of law, contrast *Milton* v. *Civil Serv. Commn.*, *supra*; they have been briefed and argued by all parties, and they implicate the rights of numerous landlords and tenants beyond this case. See *Royal Indem. Co.* v. *Blakely, supra.* For those reasons, and because the result we reach is not changed by our analysis, we discuss for future guidance the landlord's arguments that the board lacks authority to condition a general adjustment on compliance with laws governing habitability.

A. Rent control in Boston is currently authorized by St. 1969, c. 797, as amended by St. 1970, c. 863.[12] The 1969 statute was unusually brief and broadly authorized the city to "create a rent board and empower it to establish as the maximum rent[s] . . . such . . . amount[s] as may be necessary to remove hardships or correct inequities."

Section 2 of the 1970 statute inserted language which specified that the city "may authorize the board *by regulation* to make such general adjustments in such maximum rents" (emphasis inserted) as may be necessary for the same purposes. Section 2 also provided that in making general adjustments the board "shall observe the principle of maintaining maximum rents . . . at levels which will yield to landlords a fair net operating income," which was to be

---

[11] Since both the landlord and the tenants refer to this memorandum, and it was not included in the record on appeal, we have exercised our discretion to send for the original papers in this case. See *Ainslie* v. *Ainslie*, 6 Mass. App. Ct. 692, 695 n.3 (1978). Contrast *Kunen* v. *First Agricultural Natl. Bank*, 6 Mass. App. Ct. 684, 689-691 (1978).

[12] Both of these statutes were based on a legislative finding that there was a "substantial shortage of rental housing" and that residential rents must be "regulated and controlled" in order to avoid "serious threats to the public health, safety, and general welfare."

determined by giving "due consideration . . . to the following, among other relevant factors: . . . (5) substantial deterioration of the housing accommodations, other than ordinary wear and tear, or failure to perform ordinary repair, replacement or maintenance."[13]

The scope of the authority of such special enabling acts is limited to "only those powers which are expressly conferred by statute or necessarily implied from those expressly conferred . . . ." *Church* v. *Boston*, 370 Mass. 598, 601 (1976). However, where the exercise of a particular power is, in fact, necessary to carry out the purposes expressed in the statute, general principles of agency authority establish that a "regulation may be authorized even where it cannot be traced to specific statutory language." *Grocery Manufacturers of America, Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75 (1979), and cases cited. See *Town Taxi, Inc.* v. *Police Commr. of Boston*, 377 Mass. 576, 581 (1979) (holding that commissioner's broad statutory authority to "fix maximum and minimum rates" for taxi industry includes power to adopt order reducing fares for elderly and handicapped). It is further established that where, as here, an agency is vested with "broad authority" to effectuate the purposes of an act, the agency may do so by all means which are "reasonably related" to those purposes. See *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. 519, 524-525 (1979), and cases cited; *Grocery Manufacturers of America, Inc.* v. *Department of Pub. Health, supra* at 75-76 (collecting the cases). Moreover, the cases involving special rent control acts show that municipalities do possess regulatory powers of some dimension beyond those which are specifically enumerated. See *Church* v. *Boston, supra* at 601-602 (power to decontrol units entirely when vacated); *Grace* v. *Brookline*, 379 Mass. 43, 49-52 (1979)

---

[13] Two of the other factors to be considered in determining fair net operating income are as follows: "(3) major capital improvement of the housing accomodations as distinguished from ordinary repair, replacement and maintenance; (4) increases or decreases in living space, services, furniture, furnishings or equipment . . . ."

(power to bar all condominium developers from obtaining certificates of eviction).

The considerations set out in factor (5), quoted *supra*, are clearly relevant to habitability, the subject of Regulation 11, § 5(A)(3). The landlord argues, however, that factor (5) applies only to a "deterioration" of the premises from its previous condition, or to a lack of "repair, replacement or maintenance" regarding existing facilities. Thus, the argument continues, factor (5) does not apply to a "failure to install fixtures" which had never previously been provided, and Regulation 11, § 5(A)(3), therefore exceeds the scope of factor (5) to the extent that such devices would be required to comply with "all laws governing conditions of habitability."

We have no difficulty in determining that the board had authority under factor (5) to promulgate Regulation 11, § 5(A)(3), requiring compliance with laws governing conditions of habitability. Although we find no Massachusetts cases which guide us in our construction of the criteria set out in factor (5), cf. *Sherman* v. *Rent Control Bd. of Brookline*, 367 Mass. 1, 6 n.5 (1975), our conclusion that the board had authority derived from factor (5) to promulgate a regulation linking rents to repairs is amply supported by authority from the World War II period of rent control.

Section 2 of the present Boston statute is based on the prior Statewide enabling act, St. 1953, c. 434, § 5(*a*), which was derived in turn from the Federal Housing and Rent Act of 1949, c. 42, § 203(b), 63 Stat. 18 (1949). As relevant here, the provisions of these three sections are "substantially identical," see *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. 686, 705 (1971), including the five factors used to determine fair net operating income. The language of factors (4) and (5) had first appeared in regulations promulgated under two earlier Federal statutes enacted in 1942 and 1947, respectively.[14]

---

[14] The Emergency Price Control Act of 1942, c. 26, § 2(b), 56 Stat. 23, and the Housing and Rent Act of 1947, c. 163, § 204(b), 61 Stat. 193, which superseded the 1942 Act as the authority for controlling rents.

Where an amendment actually incorporates into a statute
the precise language of a regulation which sets out the ad-
ministrative construction of the statute, that enactment
constitutes an express ratification of that construction. See
*United States* v. *Leslie Salt Co.*, 350 U.S. 383, 396-397
(1956); *Red Lion Bdcst. Co.* v. *Federal Communications
Commn.*, 395 U.S. 367, 380-382 (1969); *Trans World Air-
lines, Inc.* v. *Hardison*, 432 U.S. 63, 76 n.11 (1977). It was
thus the opinion of Congress that a regulation tying rent lev-
els to habitability (i.e., "repair . . . and maintenance") was
within the authorizing language of the Federal act. Given
this, we think it significant that the language enacted by the
Massachusetts Legislature in the Boston statute is virtually
identical to that of the Federal act. Cf. *Prudential Ins. Co.
of America* v. *Boston*, 369 Mass. 542, 546 (1976).[15]

Following the expiration of the Federal act, Massachu-
setts continued to control rents under St. 1953, c. 434. Al-
though one section of that statute was held constitutional,
*Russell* v. *Treasurer & Recr. Gen.*, 331 Mass. 501, 509
(1954), we find no case directly on point in construing the
section relevant here, § 5(a). Cf. *Nayor* v. *Rent Bd. of
Brookline*, 334 Mass. 132, 133-134 (1956) (involving formu-
la which evaluated all five factors and permitted standard-

---

Ultimately, in 1949, the 1947 Act was amended to insert the provision
dealing with fair net operating income which also appears in the Boston
statute. In so doing, Congress adopted the language of the prior regula-
tions and incorporated it into the fourth and fifth factors to be considered
in making that determination. See Regulation § 1388.1181, Rent Regu-
lation for Housing §§ 5(c)(2) & 13(7), 8 Fed. Reg. 7322 (1943); Regula-
tion § 825.10, Controlled Housing Rent Regulation §§ 1 & 5(a)(2), 12
Fed. Reg. 4331 (1947). These regulations were formerly codified at 24
C.F.R. §§ 825.1 & 825.5(c)(2) (1947 Supp.).

[15] It is generally the rule in this jurisdiction to adhere to the Federal con-
struction of Federal legislation which is subsequently incorporated in a
Massachusetts statute. See *Poirier* v. *Superior Court*, 337 Mass. 522, 527
(1958); *DeCordova & Dana Museum & Park* v. *Director of the Div. of
Employment Security*, 370 Mass. 175, 180 (1976). In fact, this course was
followed in construing the section of the 1953 statute from which the sec-
tion at issue here was derived. See *Marshal House, Inc.* v. *Rent Control
Bd. of Brookline, supra* at 705-706.

ized percentage increases "according to the services given a tenant").

Recently, however, the exercise of regulatory power under a rent control statute has been upheld on a different basis. In *Flynn* v. *Cambridge*, 383 Mass. 152, 158 (1981), the Supreme Judicial Court reaffirmed that "'a grant of an express power carries with it all unexpressed, incidental powers necessary to carry it into effect.' 3 C. Sands, Sutherland Statutory Construction § 64.02 (4th ed. 1974)." Pursuant to such implied powers, it was held that the city of Cambridge had authority under its enabling statute, St. 1976, c. 36, to regulate the removal of rental units from the housing market, including removals for condominium conversion. "The power to control rents . . . is not so illusory that it does not comprehend the right and responsibility of preventing removals from its reach" where the rate of conversion would otherwise transform it into "the power to control nothing." *Flynn* v. *Cambridge*, 383 Mass. at 159.

Under reasoning of the *Flynn* case, we think that the present statute, which contains an express policy favoring "repair, replacement or maintenance" of rental units, must be construed as giving Boston at least the general authority to link a rent increase with habitability, since that power is necessary to preserve the *quality* of its rental housing stock. New Jersey has specifically approved a rent control law which includes such a regulation. In *Orange Taxpayers Council, Inc.* v. *Orange*, 169 N.J. Super. 288 (1979), the Appellate Division upheld a municipal ordinance which required "substantial compliance" with city and State housing codes as a condition of periodic increases in rent. "The coupling of certain rental increases with . . . the basic habitability of the rental unit is . . . reasonable . . . . Rent control would be self-defeating were landlords permitted to reduce maintenance expenditures and allow buildings to deteriorate because their profits have been regulated downward." *Id.* at 303. The State Supreme Court affirmed. *Orange Taxpayers Council, Inc.* v. *Orange*, 83 N.J. 246 (1980). That court held that the inclusion of the habit-

ability requirement was within the city's general statutory authority to act for the public "safety" because that authority goes "beyond mere regulation of price," *id.* at 257, and because the maintenance of habitable conditions is reasonably related to the purposes of a rent control ordinance, *id.* at 258 n.14. "No one would applaud the wisdom of lawmakers who by controlling the price of rental housing but not its quality, insured that their constituents could live in affordable dwellings that are unsafe, unsanitary and harmful to health." *Id.* at 257.

The reasoning set forth above strikes us as sound. The fact that the Legislature included in the Boston statute a policy favoring maintenance of housing conditions suggests that it also shared these concerns. Cf. *Berman & Sons* v. *Jefferson, supra* at 198-199 n.4 (noting "legislative judgment" that tenant's duty to pay rent is "bound up with" landlord's duty to maintain premises, as manifested by enactment of G. L. c. 239, § 8A). We therefore hold that it is necessarily implied that the board has at least the general authority to tie a rent increase to compliance with laws governing habitability. Contrast *Babson* v. *Boston Rent Control Admr.*, 371 Mass. 404, 405 (1976) (regulation unauthorized where plainly in conflict with unambiguous statutory definition). Otherwise, the rent control power granted by the statute could ultimately be transformed, in the language of *Flynn* v. *Cambridge, supra,* into "the power to control nothing" of a quality worth controlling.

B. The landlord next argues that the board lacked authority to promulgate § 5(A)(3) of Regulation 11 in so far as the denial of the entire amount of a general adjustment conflicts with the landlord's statutory right to receive a fair net operating income. See *Zussman* v. *Rent Control Bd. of Brookline*, 371 Mass. 632, 638-640 (1976), and cases cited; *Niles* v. *Boston Rent Control Admr.*, 6 Mass. App. Ct. at 141-148. This argument suggests that the amount of any denial should be determined by the extent to which the use of a unit is impaired by violations of the implied warranty. See *McKenna* v. *Begin*, 5 Mass. App. Ct. at 310-311.

The landlord does not suggest, however, that the amount of the increase which the board actually granted (although conditionally) was insufficient to constitute a fair net operating income. Nor does the landlord contend that the board, in fixing that amount, erred in failing to consider any of the factors set out in the statute. Rather, the landlord's objection is to the emphasis which § 5(A)(3) of Regulation 11 places on factor (5). The short answer to this objection, however, is that the "statute provides no formula for ascribing relative weights to these factors," and "substantial discretion is left with [the board] in deciding . . . what rent adjustments are to be allowed," *Sherman* v. *Rent Control Bd. of Brookline*, 367 Mass. at 8, so long as it exercises "informed judgment" in its consideration, see *id.* at 10; *World Wide Realty* v. *Boston Rent Control Admr.*, 7 Mass. App. Ct. 327, 332 (1979).[16] Accordingly, we do not think it unreasonable for the board to have concluded that it may be necessary to deny the entire amount of a rent increase to ensure compliance with the habitability requirement.[17]

---

[16] The board may have learned from experience that where only a small percentage of an increase is withheld, the landlord lacks sufficient incentive to make the necessary repairs, particularly where the cost of the repairs would exceed the amount withheld, in which case the landlord might well decide to forgo both the remainder of the increase and the repairs.

[17] Although the parties do not raise this point, we note that the Massachusetts Legislature has enacted such a provision in several other rent control enabling statutes. That provision, with slight variations, states that "[t]he board . . . may refuse to grant a rent increase under this section, if it determines that the affected rental unit does not comply with the state sanitary code and any applicable municipal codes, ordinances or by-laws, and if it determines that such lack of compliance is due to the failure of the landlord to provide normal and adequate repair and maintenance." St. 1970, c. 842, § 7(d) (Statewide act); St. 1976, c. 36, § 7(d) (Cambridge); St. 1976, c. 37, § 5(d) (Somerville). See *Palmer* v. *Rent Control Bd. of Brookline*, 7 Mass. App. Ct. 110, 118 (1979) (Statewide provision "would appear to permit" board to condition increase on "future compliance" with Sanitary Code).

However, since the Boston statute was adopted under the Home Rule Amendment, *Church* v. *Boston*, 370 Mass. at 599, and since the Legislature "lacks the authority to make significant, limiting changes . . ." in a petition adopted under § 8 of that Amendment, *id.* at 600 n.6, we

While the views embodied in a regulation do not bind us where its very authority is in issue, see *Niles* v. *Boston Rent Control Admr.*, 6 Mass. App. Ct. at 149, such an administrative judgment is entitled to weight, particularly where the legislative policy is only broadly set out in the statute. See *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 850 (1977); *Amherst-Pelham Regional Sch. Comm.* v. *Department of Educ.*, 376 Mass. 480, 491-492 (1978). Further, it is generally the rule that a properly promulgated regulation is accorded "all rational presumptions in favor of [its] validity . . ." under the statute, *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. at 525, quoting from *Consolidated Cigar Corp.* v. *Department of Pub. Health, supra* at 855, and this rule also applies under special enabling statutes, see *Grace* v. *Brookline*, 379 Mass. at 49-50 (town by-law presumed valid).

In addition, we do not think that § 5(A)(3) abrogated the landlord's right to a fair net operating income. Rather, it merely delayed the commencement of the adjustment, in effect leaving it up to the landlord to determine when it would begin. Analytically, the situation here is not unlike that presented in *Grace* v. *Brookline, supra.* There it was held that the town's denial of certificates of eviction to all condominium developers furthered the statutory purpose of preserving the supply of rental units by "retarding" conver-

---

may not look to these other statutes as evidence of what the Legislature intended here. *Id.* The singularity of such special rent control acts has also been recognized in several cases dealing with the Brookline statute, St. 1970, c. 863. See *Marshal House, Inc.* v. *Rent Control Bd. of Brookline*, 358 Mass. at 697-699 and n.6; *Grace* v. *Brookline*, 379 Mass. at 50-51 & n.14. We therefore draw no inference, as we otherwise might, from the fact that the provision quoted above does not appear in the Boston statute, see 2A Sutherland Statutory Construction, *supra*, § 51.02, even though it was enacted on the same day as the Statewide act, see 1A Sutherland Statutory Construction, *supra*, § 23.17. Nor is anything to be inferred from the fact that this provision does not apply to violations of State statutes or the State Building Code. The Boston statute is simply silent on this issue. For that reason, the power set forth in this provision may be implied if its exercise is, in fact, necessary to accomplish the purposes of the act.

sion to condominiums, but also "fairly accommodate[d] the interests of building owners" in so far as it did not "preclude condominium conversion altogether." *Id.* at 51. Likewise here, the board has not precluded the landlord from "any possibility" of receiving a fair net operating income. See *Orange Taxpayers Council, Inc.* v. *Orange*, 83 N.J. at 260. Rather, the landlord could have avoided any delay in the adjustment by remedying the violations for which it was imposed. "Since the notion of a 'just and reasonable return' embraces a landlord's responsibilities to his tenants as well as his right to receive sufficient income, we perceive no inherent defect in . . . [a regulation] that prevents increases in rent for defective premises." *Id.* See also *Rosen* v. *Weaver*, 7 Misc. 2d 576, 578 (N.Y. Sup. Ct. 1957).

3. The landlord also makes a series of arguments based on what is said to be the reasonableness of its actions here. The landlord first argues that it could not reasonably determine what equipment was required by G. L. c. 143, § 3R. It is apparently true that on May 10, 1977, the Boston building department reversed its prior position and adopted the view that the statute required electric striker mechanisms. But there is nothing in the record to establish that the landlord had previously made any effort to comply with the statute during the nine months when the building department agreed with the landlord as to its requirements. Nor did the landlord subsequently install even the locks which it believed to be required (and which were ultimately held to be required) during the pendency of its action before the Appeals Board. The fact of the matter is that the landlord was never in compliance with the statute during the period for which the general adjustment was denied. For that reason, such denial was not error.

As to the other arguments based on the alleged reasonableness of the landlord's actions, we conclude that they either lack merit or raise no question of law not already considered above.

4. Finally, the landlord alleges a number of procedural defects in the board's proceedings. We think that the ten-

ants' affidavit in opposition to the adjustment was properly processed under § 6(A)(1) rather than § 6(A)(2) of Regulation 11. As to the landlord's other allegations, we need not deal with them individually, because all of them are without significance in the present circumstances. See *Niles* v. *Boston Rent Control Admr.*, 6 Mass. App. Ct. at 150.

*Judgments affirmed.*