PROFESSIONAL FIRE FIGHTERS OF MASSACHUSETTS & others[1]
*vs.* COMMONWEALTH & others.[2]

No. 06-P-1511.

Suffolk. November 19, 2007. - June 16, 2008.

Present: BERRY, MILLS, & SIKORA, JJ.

*Department of Public Health. Medicine. Practice, Civil,* Standing, Declaratory
proceeding. *Administrative Law,* Standing, Regulations, Emergency
regulations. *Regulation.*

Discussion of the Legislature's enactment of a comprehensive upgraded
scheme for the coordinated delivery of emergency medical services
throughout the Commonwealth, St. 2000, c. 54, § 3, and certain regula-
tions promulgated by the Department of Public Health for implementation
of that effort. [68-72]
In an action for declaratory and injunctive relief brought by two representative
associations and four individual members of the fire fighting profession
engaged in the provision of emergency medical services (plaintiffs), seek-
ing to challenge the validity of regulatory amendments promulgated by the
Department of Public Health (department) regarding the dispatch of such
services to certain sites, the trial court judge properly granted judgment on
the pleadings in favor of the department on the ground that the plaintiffs
lacked standing to bring suit under both the Declaratory Judgment Act,
G. L. c. 231A, § 2, and the Administrative Procedure Act, G. L. c. 30A,
§ 7, where the plaintiffs failed to identify an interest created for them by
the applicable statute and a reasonably definite injury to that interest
caused by a breach of duty by the department. [73-78]
Plaintiffs seeking to challenge the validity of emergency regulatory amend-
ments promulgated by the Department of Public Health (defendant) regard-
ing the provision of emergency medical services failed to demonstrate that
the defendant violated the emergency rulemaking process authorized by
G. L. c. 30A, § 2 [78-79], or that the amendments so exceeded and
contradicted the terms of their enabling legislation as to become invalid
[79-81].

[1]The Fire Chiefs Association of Massachusetts; Robert B. McCarthy,
president of the Professional Fire Fighters of Massachusetts; David A. LaFond,
president of the Fire Chiefs Association of Massachusetts; George Baker; and
Michael L. Aries.

[2]The Governor and the Commissioner of the Department of Public Health
(commissioner), as commissioner and as chair of the public health council.

CIVIL ACTION commenced in the Superior Court Department on May 25, 2004.

The case was heard by *Charles T. Spurlock*, J., on a motion for judgment on the pleadings.

*Harold L. Lichten* (*Leah M. Barrault* with him) for the plaintiffs.

*Amy Spector*, Assistant Attorney General (*Carol D. Balulescu* with her) for the defendants.

SIKORA, J. In the year 2000 the Legislature enacted a comprehensive upgraded scheme for the coordinated delivery of emergency medical services (EMS) throughout the Commonwealth (the statute or EMS 2000).[3] It designated the Department of Public Health as the "lead agency" for implementation of that effort. G. L. c. 111C, § 3(*b*). Under authority of the statute, the department promulgated regulations in 2003 and certain amendments to those regulations in 2004. By the present action for declaratory and injunctive relief, two representative associations and four individual members of the fire fighting profession engaged in the provision of emergency medical services (collectively, providers) challenge the validity of the regulatory amendments governing the dispatch of services to sites housing vulnerable residents, such as nursing homes and assisted living facilities. By a comprehensive memorandum of decision, a judge of the Superior Court entered judgment on the pleadings in favor of the defendants. See Mass.R.Civ.P. 12(c), 365 Mass. 754 (1974). The providers have appealed. For the following reasons we affirm the judgment.

*Background.* 1. *The parties.* Because standing is a ground for disposition, we describe specifically the roles of the plaintiff providers. The plaintiff Professional Fire Fighters of Massachusetts (PFFM) serves as the collective bargaining agent for fire fighters, emergency medical technicians, and paramedics in cities and towns throughout the Commonwealth. The plaintiff Fire Chiefs Association of Massachusetts (FCAM) is a State-wide membership of fire chiefs organized to promote the professional advancement of the fire service. Both organizations hold positions in the Emergency Medical Care Advisory Board

---

[3]Statute 2000, c. 54, § 3, now codified as G. L. c. 111C, §§ 1-24, and replacing in toto former G. L. c. 111C.

(EMCAB), an entity created by the statute and entitled to "a reasonable opportunity to review and make recommendations" upon all regulations considered for adoption by the department under EMS 2000. G. L. c. 111C, § 3(*c*). EMCAB consists of over thirty specified constituent organizations and individuals. See G. L. c. 111C, § 13(*a*). It functions in "a general advisory capacity, [and] shall assist in coordinating the efforts of all persons and agencies in the state concerned with the EMS system, and shall render advice on the development of the EMS system where needed." G. L. c. 111C, § 13(*b*). Plaintiff Michael L. Aries is a fire fighter for the Natick fire department and the representative of PFFM in EMCAB. Plaintiff George Baker is the chief of the Mashpee fire and rescue department and the representative of FCAM in EMCAB. Plaintiffs Robert B. McCarthy and David A. LaFond serve as the presidents of PFFM and FCAM, respectively. LaFond also is chief of the Holyoke fire department.

The providers have named as defendants the Commonwealth, the Governor, and the Commissioner of Public Health (commissioner). In substance, the providers direct all claims and requests for relief against the department. We shall refer to the defendants collectively as the department.

2. *The statutory scheme.* The broad purpose of EMS 2000 is the creation of "a statewide, community-based EMS system that reduces premature death and disability from acute illness and injury through the coordination of local and regional emergency medical services resources throughout the continuum of care." St. 2000, c. 54, § 1(1). For that purpose the broad mandate of the department is to ensure, by planning, guidance, and coordination, that the EMS systems will deliver "adequate and appropriate EMS for all persons requiring the services, including . . . all special populations. . . ." G. L. c. 111C, § 2(1).[4] As "the state lead agency for EMS," the department possesses enumerated powers and duties, including but not limited to development of a plan for a cost-effective distribution of all elements of the EMS resources and services throughout the Commonwealth. G. L. c. 111C, § 3(*b*)(6).[5]

---

[4]Section 2(1) directs the department to use "appropriate elements of the EMS system" for "the special needs of children and other special populations."

[5]That expansive mission includes establishment of standards for training

The statute created several organizational units for coordination by the department. A "local jurisdiction" is an entity authorized by a municipal or special district legislative body to select providers for its geographical area. G. L. c. 111C, § 1. Multiple local jurisdictions may combine to create a single "service zone." *Ibid.*

The department may aggregate such zones into regions. See *ibid.* Regional EMS councils consist of ten to thirty-five persons, nine of whom must meet statutory occupational requirements (of likely familiarity with EMS) and one of whom must be a consumer of those services. G. L. c. 111C, § 4(*b*). The department designates one such council for each region. *Ibid.* The responsibility of the council is to "plan, implement and evaluate the EMS system in its region" in accordance with the statute and the regulations, guidelines, and policies of the department.[6] *Ibid.*

Finally, the Emergency Medical Care Advisory Board (EMCAB) consists of the commissioner or the commissioner's designee as chairperson, of two members of each EMS regional council, and of thirty other statutorily prescribed designees encompassing governmental bodies and private organizations dedicated to service of the public health and safety, including representatives of the plaintiffs PFFM and FCAM, and encompassing three consumer representatives. G. L. c. 111C, § 13(*a*). EMCAB members serve for three years without compensation. *Ibid.* The department must afford EMCAB a

---

and certification of personnel such as emergency medical technicians and EMS first responders, G. L. c. 111C, § 3(*b*)(3), 3(*b*)(13), & 3(*b*)(14); creation of standards, inspection, and licensure for first response services and ambulance services, G. L. c. 111C, § 3(*b*)(5); development of a Statewide communications system, G. L. c. 111C, § 3(*b*)(23); establishment of criteria for the award and administration of service contracts, G. L. c. 111C, § 3(*b*)(16) & 3(*b*)(17); the collection and maintenance of data and records upon the status of service recipients, G. L. c. 111C, § 3(*b*)(15); inspection of the equipment, supplies, facilities, and records of an EMS provider, G. L. c. 111C, § 3(*b*)(22); and the provision of technical assistance to local governments and EMS providers, G. L. c. 111C, § 3(*b*)(19).

[6]Those duties include creation of a regional plan for delivery of services, the collection and maintenance of data, assistance in the provision of training programs, and the performance of such other functions as the department might assign. G. L. c. 111C, § 4(*c*).

"reasonable opportunity to review and make recommendations on" all proposed regulations. G. L. c. 111C, § 3(*c*).

Each local jurisdiction, or each combination of local jurisdictions, forming a service zone must prepare "a service zone plan that identifies, coordinates and makes optimal use of all available EMS resources within each service zone." G. L. c. 111C, § 10(*a*). The plan must include, among other information about providers and their capacities, a "coordination of EMS first response [service], primary ambulance response [service] and all other ambulance service" contemplated for emergency duties, including private provider contracts for such services. G. L. c. 111C, § 10(*a*)(1), 10(*a*)(2), & 10(*a*)(5).

An "EMS first response service" (EFR service) is an EMS-qualified agency or business, public or private, called to provide emergency medical care by rapid response or response in the shortest practicable amount of time. G. L. c. 111C, § 1. An EFR service is not necessarily an ambulance. It can be emergency medical technicians, or police or fire fighting personnel, called to the scene because they are closest, have EMS skills and equipment, and can respond immediately. EFR services stabilize a victim on site and increase the chance for survival.

By contrast, "primary ambulance response" means pre-hospital treatment and transportation. *Ibid.* Only the designated "primary ambulance service" may transport a patient to the hospital in response to a call for emergency medical service. See G. L. c. 111C, §§ 1, 10(*b*), & 10(*c*). For most emergency calls, the service zone plan may designate either a public provider or a private for-profit company as the primary ambulance response. G. L. c. 111C, §§ 1 & 10(*b*). The primary ambulance service may make "agreements with other qualified ambulance services, in order to meet the standards for primary ambulance response established by the service zone." G. L. c. 111C, § 10(*c*).

Service zone plans originate from the local jurisdictions, pass forward for review by the regional councils, and then advance for ultimate assessment by the department. G. L. c. 111C, § 10(*a*). The department effectively approves the designation of service zone providers, including EFR services and primary ambulance services.

3. *The adoption of regulations.* On June 24, 2003, the depart-

ment approved its first regulations under EMS 2000. The provisions directed a local jurisdiction to require in its service zone plan the dispatch of both an EFR service *and* a primary ambulance service to every emergency medical response call (typically made through the 911 system). See 105 Code Mass. Regs. § 170.510(I)(1)(a)-(d) (2003).[7]

On May 25, 2004, the department approved emergency amendments to the regulations "in order that local jurisdictions may begin the service zone planning process without undue delay." 1002 Mass. Reg. 27, 29 (June 18, 2004). The amendments removed the discretion of local jurisdictions to compel the dispatch of EFR services to nursing homes and assisted living facilities (collectively, nursing homes) maintaining licensed twenty-four-hour health care personnel on site in circumstances in which those personnel determine the resident patient's condition not to warrant a 911 call and in which the nursing home maintains direct contractual ambulance services. See 105 Code Mass. Regs. § 170.510(I)(3)(f) (2004); 1002 Mass. Reg. 29-30 (June 18, 2004) (emergency amendment effective May 25, 2004).[8] The amendment gave on-site health care personnel dis-

---

[7] In pertinent part that regulation recited:

"Local jurisdictions shall ensure that each service zone plan contains, at a minimum, the following elements:

". . .

"(I) Operational plan for ensuring dispatch and response to emergencies of the closest, appropriate, available EMS services, . . . including:

"(a) primary ambulance service;

". . . *and*

"(d) EFR services, if any" (emphasis added).

[8] The emergency amendment added the following provision:

"(f) No service zone plan may include criteria for the notification and dispatch of a designated EFR service to a facility licensed pursuant to [G. L.] c. 111, § 71 [an infirmary, convalescent or nursing home, rest home, charitable home for the aged, or intermediate care facility for the mentally retarded], or certified pursuant to [G. L.] c. 19D [an assisted living facility], where there is a licensed health care professional on site 24 hours per day seven days per week, and where there is a provider contract in place to provide primary ambulance response, unless a

cretion to summon both an emergency first responder and a primary ambulance service, or only primary ambulance service.

On May 27, 2004, the department scheduled a meeting of EMCAB for June 14, 2004, to provide that body "with the opportunity to review and make recommendations on these [amendments], prior to the public hearing and finalization of the regulations." In addition, the department scheduled a public hearing on the amendments for July 6, 2004. The meeting and the hearing went forward. The four individual plaintiffs and numerous other participants presented views at the public hearing. The department promulgated the amendments as permanent regulations on August 13, 2004.[9] See 1006 Mass. Reg. 71-72 (August 13, 2004). They became effective that day. *Ibid.*

4. *The litigation.* The plaintiff providers filed this action in the Superior Court on the same day as the approval of the emergency amendments, May 25, 2004. After promulgation of the amendments as permanent regulations on August 13, 2004, the providers filed an amended supplemental complaint for declaratory and injunctive relief against their implementation. The department answered, and then moved for judgment on the pleadings.[10] The providers cross-moved for judgment on the pleadings and ultimately for summary judgment.

---

licensed health care professional at such facility requests primary ambulance response by dialing the emergency telephone access number 911, or its local equivalent. Nothing herein shall bar any person from dialing 911 or its local equivalent."

The department simultaneously approved a second emergency amendment compelling nursing homes to develop criteria (based on factors including the patient's medical condition and the ambulance service response time capability) governing emergency transport and specifying the circumstances (1) in which attendant personnel should call 911 and summon both EFR and primary ambulance service, and (2) in which those personnel may contact only the home's contractual ambulance company for primary response. 105 Code Mass. Regs. § 150.002(H) (2004); 1002 Mass. Reg. 27-28 (June 18, 2004) (emergency regulation effective May 25, 2004).

[9]The department adopted one change to the amendments, immaterial to our discussion. For simplicity, all further citations to the amendments will refer to the 2004 permanent regulations.

[10]The department moved under Mass.R.Civ.P. 12(c) (judgment on the pleadings), but contended also that dismissal under Mass.R.Civ.P. 12(b)(1) and 12(b)(6), 365 Mass. 755 (1974), was appropriate for lack of jurisdiction (absence of standing and mootness).

The providers sought a declaration of the invalidity of the amendments on the procedural grounds that the department had denied EMCAB a reasonable opportunity for review and recommendation within the meaning of G. L. c. 111C, § 3(*c*), and that it had lacked a genuine basis for emergency promulgation in circumvention of the usual notice and public hearing requirements of the Administrative Procedure Act, G. L. c. 30A, § 2. They alleged also the substantive ground of invalidity by reason of the character of the amendments as arbitrary, capricious, and contradictory of the enabling terms of EMS 2000. The motion judge concluded that the providers lacked standing to press their claims.[11] Alternatively, he ruled that the claims lacked merit because the amendments had developed from procedure ultimately compliant with the role of EMCAB and the rulemaking requirements of the Administrative Procedure Act, G. L. c. 30A, § 2, and because they comprised a rational choice permitted by EMS 2000.

*Discussion.* 1. *Standard of review.* No material facts are at issue. The motion for judgment on the pleadings under rule 12(c) challenges the legal sufficiency of the complaint after the submission of an answer. See *Burlington* v. *District Attorney for the Northern Dist.*, 381 Mass. 717, 717-718 (1980); *Minaya* v. *Massachusetts Credit Union Share Ins. Corp.*, 392 Mass. 904, 905 (1984). Consequently, we are examining conclusions of law upon the same record as the motion judge. That assessment proceeds de novo.

2. *Standing.* The providers allege two categories of harm as the result of the amendments. First, they argue that health care personnel at nursing homes will often lack the competence to distinguish between emergencies requiring *both* the first responder service most typically furnished by a fire department and successive primary ambulance transport, on the one hand,

---

[11]In the amended supplemental complaint, the plaintiff providers alleged in toto (1) procedural invalidity by violation of EMCAB's entitlement to review and comment, count one; (2) procedural invalidity by reason of specious use of the emergency rulemaking authority of G. L. c. 30A, § 2, count two; (3) substantive invalidity by reason of conflict with EMS 2000 and arbitrary, capricious character, count four; and (4) the resulting impropriety under EMS 2000 of the issuance to local jurisdictions of any service zone applications deviating from the original 2003 regulations, counts three and five.

and *only* primary ambulance service, on the other. They argue that such a deficiency would endanger the lives of nursing home patients. Second, they contend that the amendments authorize emergency calls outside the 911 system and thereby eliminate a public record of the dispatch and transport times of private ambulance companies. That deficiency would interfere with the ability of the fire department and the local jurisdiction to monitor and to enforce the performance of the ambulance companies under EMS standards. The providers view their duties under the statute to include both their own performance and the enforcement of the other providers' performance in accordance with those standards.[12]

They invoke standing and jurisdiction under the Declaratory Judgment Act, G. L. c. 231A, § 2, and the Administrative Procedure Act, G. L. c. 30A, § 7.[13] Both sources authorize a challenge to an administrative regulation. The challenger must present both an actual controversy and the standing to wage that controversy. Although those requirements "should be liberally construed . . . , there are limits to the matters which can be heard in an action for a declaratory judgment." *Massachusetts Assn. of Indep. Ins. Agents & Brokers, Inc.* v. *Commissioner of Ins.*, 373 Mass. 290, 293 (1977). In declaratory lawsuits attacking the validity of statutes or regulations, "[a] party has standing when it can allege an injury within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." *Ibid.* See *Ginther* v. *Commissioner of Ins.*, 427 Mass. 319, 323 (1998). An alternate expression of this point is that the plaintiff's interest must lodge within a "zone of interest" arguably protected by a statute; and that an act or omission of the defendant has violated a duty owed to the

---

[12]The providers propose a third ground for standing: their membership in EMCAB and the denial of a reasonable opportunity for review and recommendations upon the amendments by that body. G. L. c. 111C, § 3(*c*). We address it in note 16, *infra*.

[13]General Laws c. 30A, § 7, authorizes judicial review of any regulation and of the sufficiency of the reasons for adoption of an emergency regulation by means of the declaratory judgment mechanism of G. L. c. 231A.

The declaratory judgment act itself does not serve as an independent source of standing. *Pratt* v. *Boston*, 396 Mass. 37, 42-43 (1985). Standing is an issue of subject matter jurisdiction. *Doe* v. *The Governor*, 381 Mass. 702, 705 (1980).

plaintiff. *Penal Insts. Commr. for Suffolk County* v. *Commissioner of Correction,* 382 Mass. 527, 532 (1981). *Enos* v. *Secretary of Envtl. Affairs,* 432 Mass. 132, 135 (2000). A further requirement addresses the quality of the claimant's harm. Injury of a nature "speculative, remote, and indirect [is] insufficient to confer standing." *Ginther* v. *Commissioner of Ins., supra* at 323. See *Massachusetts Auto Body Assn.* v. *Commissioner of Ins.,* 409 Mass. 770, 780-781 (1991); *Burlington* v. *Bedford,* 417 Mass. 161, 164-165 (1994). We ask, then, whether the providers here have identified an interest created for them by the statute and a reasonably definite injury to that interest caused by a breach of duty by the department. Under those criteria the providers' standing encounters two hurdles, one party-based and the other claim-based.

The primary injury alleged is that the amended regulation will result in delayed emergency medical treatment for nursing home residents. That interest belongs obviously to the recipients of emergency medical services, and not to the providers. The thrust of EMS 2000 is concern for those members of the public in need of urgent care, especially vulnerable populations. G. L. c. 111C, § 2(1). PFFM, FCAM, and the individual fire fighters may serve those beneficiaries but they do not replace them as parties in interest.[14]

The additional injury claimed is that the amended regulation will prevent local jurisdictions, including fire departments, from tracking the response times of private ambulance companies and from holding them accountable to EMS standards. However, the statute assigns that function specifically to the local jurisdictions, typically the entity authorized by a municipal legislative body to author the service zone plan and to select service providers, and not to the fire department or to representative associa-

---

[14]The providers have not presented either in the Superior Court or upon appeal any theory of ius tertii or third-party standing. That is, they have never alleged that nursing home patients possess a grievance, that they cannot be present to assert it, and that the providers so closely share an interest with those absentees as to be qualified to litigate the grievance for them. See *Planned Parenthood League of Mass., Inc.* v. *Bell,* 424 Mass. 573, 578-579 (1997) (physicians had representational standing to assert the rights of female patients). If the providers had developed such a theory, it too would fail by reason of the indefinite and speculative character of the claimed injury.

tions of the fire fighters.[15] Consistently, the unchallenged regulations leave to the local jurisdiction the selection of a process for monitoring compliance with local standards. See 105 Code Mass. Regs. § 170.510(F) (2004). If a local jurisdiction fails to provide for a satisfactory monitoring process, the department retains authority to disapprove the service zone plan, and inferably the lesser included authority to remand a plan for specified improvements. See G. L. c. 111C, § 10(*a*); 105 Code Mass. Regs. § 170.530(B) (2004).

The claim-based hurdle confronting the providers' standing is the speculative character of the harm imputed to the amended regulation. The providers hypothesize that certified nursing home personnel will fail to identify situations requiring an emergency first responder. The original and amended complaints and the motion papers in the Superior Court identified no such instances as of the times of filing.

A number of safety mechanisms work against that fear. The amendment itself specifically advises nursing home administrators and care givers that "[n]othing herein shall bar any person from dialing 911 or its local equivalent." 105 Code Mass. Regs. § 170.510(I)(3)(f) (2004). As the motion judge observed, it never precludes a call to an emergency first responder by an attendant concerned enough to summon a primary ambulance service. The companion amendment to the regulation commands the subject facilities to develop specific guidance for the decision whether to use 911 to summon both the EFR service and the primary ambulance. See 105 Code Mass. Regs. §§ 150.002(H) & 170.249 (2004). All primary ambulance services must satisfy the minimum response times set in the service zone plan and must satisfy the supervision of the local jurisdiction. See 105 Code Mass. Regs. §§ 170.510(C), 170.510(D), 170.510(F), 170.530(B) & 170.540 (2004). Finally, the department has published to long-term care facilities guidelines for emergency ambulance transport. These include the "expectation" that the facility policy "will

[15]See G. L. c. 111C, § 10(*a*) (service zone plans shall be developed "by the local jurisdiction," defined in G. L. c. 111C, § 1, as the entity empowered by the town legislative body, including a city council, board of selectmen, mayor, or town manager, to select service providers); 105 Code Mass. Regs. § 170.510(F) (2004) (service zone plans must include a process for monitoring compliance with local standards for EMS performance).

direct the licensed health care professional to call 911 or the equivalent, local EMS response system when the patient's chief complaint cannot be determined . . . ." Guidelines for Long Term Care Facility Emergency Ambulance Transport Policies and Procedures (issued September 20, 2004). These safeguards further qualify the predicted harm as indefinite and hypothetical.[16]

In sum, the providers do not constitute injured litigants in the judicial process, but rather disappointed advocates in the administrative rulemaking process. They are contesting not the lawfulness of the amended regulation, but rather its prudence. The gain of the fire fighters from their present arguments would consist only of more hard and stressful work. Their position may well reflect an honorable professional perception of the public safety. Nevertheless, the virtue of a plaintiff's purpose cannot by itself create the standing to maintain a lawsuit. The law does not permit the judiciary to decide the wisdom of policy-making differences within the legislative and executive branches of government. Those differences remain subjects for further experience, legislation, and rulemaking in which the plaintiffs should participate. Meanwhile, neither "the intensity of the litigant's interest [nor] the fervor of his advocacy" permits a court to ignore the fundamental requirement of standing. *Pratt* v. *Boston*, 396 Mass. 37, 42 (1985), quoting from *Valley Forge College* v. *Americans United for Separation of Church & State*, 454 U.S. 464, 486 (1982).

---

[16]In the Superior Court the providers pressed an additional argument for standing. They pointed out that PFFM and FCAM were statutory members of EMCAB and that plaintiff fire fighters Michael Aries and George Baker served, respectively, as the representatives of those organizations within EMCAB. They contended that the original emergency promulgation of the amendment circumvented EMCAB's entitlement to review and recommendation under G. L. c. 111C, § 3(*c*), and derivatively the same right of those four plaintiffs. They have made reference to the argument on appeal. It does not support standing. As the motion judge observed, no statutory language appears to confer a cause of action against the department for omission of EMCAB's advisory function, especially in the emergency rulemaking procedure authorized by G. L. c. 30A, § 2. In addition, EMCAB consists of at least thirty officials, individuals, and representatives from public and private organizations. See G. L. c. 111C, § 13. The plaintiff providers comprise only two of those constituents. EMCAB can act as a board only by a majority vote of a quorum; a quorum is fifty-one per cent of the membership. EMCAB Operating Rules § I(F)-(G) (revised March 13, 2000). Consequently, the providers cannot claim standing to litigate for the aggregate interest of EMCAB.

As an independent and alternative ground for entry of judgment on the pleadings, the judge resolved the providers' challenges to the use of the emergency rulemaking process and the validity of the resulting regulation.

3. *The procedural claim.* The providers contend that the department violated the emergency rulemaking process authorized by G. L. c. 30A, § 2, and thus rendered the emergency amendments and the subsequent permanent amendments invalid. They say specifically that no circumstances justified the issuance of the emergency amendments on May 25, 2004; and that the department's subsequent conformity with the requirements of G. L. c. 30A, § 2, for notice (a minimum of twenty-one days) and public hearing preceding the adoption of the amendments as permanent did not cure their invalidity.

Section 2 of c. 30A permits immediate amendment of a regulation "necessary for the preservation of the public health, safety or general welfare" if the agency determines that observance of the usual requirements of notice and public hearing "would be contrary to the public interest." G. L. c. 30A, § 2, as appearing in St. 1976, c. 459, § 2. Most importantly, § 2 limits the life of an emergency regulation to no longer "than three months unless during that time the agency gives notice and holds a public hearing as required in this section . . . ." *Ibid.*

The standard for review of an agency determination of emergency circumstances is extremely deferential. The court inquires whether the finding had a "substantial basis." *American Grain Prod. Processing Inst.* v. *Department of Pub. Health*, 392 Mass. 309, 323 (1984), quoting from *Pioneer Liquor Mart, Inc.* v. *Alcoholic Bevs. Control Commn.*, 350 Mass. 1, 10 (1965). The finding receives "every presumption in its favor and is not subject to question in judicial proceedings unless palpably wrong." *Robinson* v. *Secretary of Admn.*, 12 Mass. App. Ct. 441, 450 (1981). Accord *Berrios* v. *Department of Pub. Welfare*, 411 Mass. 587, 594 (1992).

Here the department stated (as required by G. L. c. 30A, § 2) that it was "promulgating the amendments immediately in order that local jurisdictions may begin the service zone planning process without undue delay." 1002 Mass. Reg. 29 (June 18, 2004). The providers question that explanation because local

jurisdictions were not required to be covered by an approved service zone plan until the close of 2006. 105 Code Mass. Regs. § 170.530(A) (2004). However, as of May 25, 2004, approximately four years had elapsed since the enactment of EMS 2000. If service zone plans were encountering difficulties and bureaucratic inertia in their preparation and if, as the explanation suggests, the department had still not received them, we cannot say that its choice of an accelerant amendment was so "palpably wrong" as to eliminate its presumptive allowance. The motion judge correctly applied the standard of review.[17]

The providers argue in a conclusory manner that the department should not be able to ratify artificial emergency regulations by subsequent permanent ones even if the later provisions have complied with the rulemaking requirements of notice and public hearing prescribed by G. L. c. 30A, § 2. No cited authority supports that contention. As we have seen, the emergency provisions here were not invalid. Even if we were to assume for argument their invalidity, the department's prompt compliance with G. L. c. 111C, § 3(*c*), by provision of the EMCAB meeting on June 14, 2004, and with G. L. c. 30A, § 2, by the timely notice and public hearing of July 6, 2004, would have superseded and cured any deficiencies of the emergency procedure. The record shows no harm to have resulted during the emergency interim of May 25 through August 13, 2004. Consequently the procedural claims are moot.[18]

4. *The validity of the amendment.* Finally, the providers argue

---

[17]The emergency process did not violate EMCAB's entitlement to "a reasonable opportunity" for review and recommendation created by G. L. c. 111C, § 3(*c*). A coordinated application of that provision and G. L. c. 30A, § 2, would permit the emergency regulations to bypass EMCAB consultation so long as EMCAB received its opportunity before any permanent adoption. It is undisputed that EMCAB did exercise that opportunity on June 14, 2004. As the motion judge pointed out, EMS 2000 required EMCAB's consultation, but not its approval, for adoption of regulations.

[18]The providers have argued that not only procedural defects but also ulterior motives tainted the emergency and then the permanent amendments because the department was implementing the interests of the private ambulance industry and the related influence of a State legislator and the then Lieutenant Governor, rather than the public interest. These conclusory allegations appeared in the original and amended complaints. The validity of legislation and rulemaking could not feasibly and does not lawfully depend upon a judicial investigation of motives. The record established no unlawful behavior. The

that the amendment exceeds and contradicts the terms of EMS 2000 so as to become invalid. They reason specifically that the challenged amendments will "arbitrarily" deprive nursing home patients of potentially life-saving first responder services; and that they will effectively allow nursing homes and other institutions "to opt out of a local jurisdiction's 911 emergency call system." They view these shortcomings as a violation of the purpose of EMS 2000 "to reduce premature death and disability."

As usual, an assault against the validity of a public safety regulation encounters a strong battery of administrative law canons deployed among familiar precedents. The standard of review is extraordinarily deferential. A duly promulgated regulation is presumptively valid; like a statute, it enjoys all reasonably favorable interpretations for its effective operation. *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, 379 Mass. 70, 75, 79 (1979). *Purity Supreme, Inc.* v. *Attorney Gen.*, 380 Mass. 762, 776 (1980). *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 771 (2002). An agency has broad and reasonably implied powers to promulgate regulations, may exercise considerable leeway in the interpretation of its enabling legislation, and may define the legislation more precisely by regulation. *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health*, *supra* at 75. *Beth Israel Hosp. Assn.* v. *Board of Registration in Med.*, 401 Mass. 172, 176 (1987). *Altschuler* v. *Boston Rent Bd.*, 12 Mass. App. Ct. 452, 461 (1981). A reviewing court will "not declare [a regulation] void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). The plaintiff must show "the absence of any conceivable grounds" in support of the regulation. *Massachusetts*

legislative and administrative rulemaking processes permit interested public and private advocates to press their competing views. "Where statutory language clearly authorizes actions taken by an agency, the actions are wholly lawful, and we need not look behind them to determine the agency's motives." *Massachusetts Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 776-777 & n.13 (2002). The motion judge correctly ruled the question of subjective motives to be immaterial as a result of the objective validity of the amendments.

*Fedn. of Teachers, AFT, AFL-CIO* v. *Board of Educ., supra* at 771, quoting from *Purity Supreme, Inc.* v. *Attorney Gen., supra.*

The providers have not demonstrated that the amendment fails to serve a statutory purpose. A fundamental objective of EMS 2000 is the "*optimal* use of all available EMS resources within each service zone" (emphasis supplied). G. L. c. 111C, § 10(*a*). It seeks to reduce preventable death, disability, and injury through "coordination" of resources. St. 2000, c. 54, § 1(1). One visible goal of the legislation is the efficient or nonduplicative use of emergency medical personnel and equipment. The department could reasonably pursue that objective by elimination of the mandatory dual reaction of a first responder and a primary ambulance service to every nursing home and similar facility staffed by professional health care providers. It has left in place the facility's capacity to summon both services in appropriate and even doubtful situations. It is reasonably conceivable that, in events of widespread urgency or mass casualties, the amended process will reduce redundant responses and better distribute emergency services to save lives. The disputed amendments reduce to a question of technical judgment entrusted to the department. The motion judge correctly reasoned that the amendments are "reasonably related to the purposes of the enabling legislation." *Consolidated Cigar Corp.* v. *Department of Pub. Health, supra,* quoting from *Mourning* v. *Family Publications Serv., Inc.,* 411 U.S. 356, 369 (1973).

*Conclusion.* We therefore affirm the judgment on the pleadings in favor of the defendants.

*So ordered.*