ORANGE TAXPAYERS COUNCIL, INC., A NEW JERSEY CORPO-
RATION, THE TERRACE, INC., A NEW JERSEY CORPORA-
TION, ARTHUR CLAY, ROBERT MANGUS AND CORA MAN-
GUS, T/A ORANGE TOWERS, PLAINTIFFS-APPELLANTS, v.
CITY OF ORANGE, A MUNICIPAL BODY POLITIC OF THE
STATE OF NEW JERSEY, THE RENT LEVELING BOARD OF
THE CITY OF ORANGE, EDWARD FERRARI, MARION STEW-
ART, KENNETH CONDON, BEVERLY SAVAGE, RALPH PER-
RELLA, BRENDA HARRINGTON, ORANGE TENANTS ASSO-
CIATION, A/K/A "OTA" AND BARBARA DAVIS, DEFEND-
ANTS-RESPONDENTS.

Argued February 5, 1980—Decided June 17, 1980.

248

*Walter R. Cohn* argued the cause for appellants (*Walter R. Cohn*, attorney; *Richard Flexner*, on the brief).

*Elliot M. Baumgart* argued the cause for respondents City of Orange, The Rent Leveling Board of the City of Orange, Edward Ferrari, Marion Stewart, Kenneth Condon, Beverly Savage, Ralph Perella and Brenda Harrington (*Elliot M. Baumgart*, attorney; *David H. Ben-Asher*, of counsel and on the brief).

*Joan Pransky* argued the cause for respondents Orange Tenants Association a/k/a "OTA" and Barbara Davis (*Timothy Weeks*, Executive Director, Essex County Legal Services, attorney).

The opinion of the Court was delivered by

PASHMAN, J.

This is the third of three related cases challenging municipal power to prevent the deterioration of rented residential housing.[1] Here we consider the validity of a rent control ordinance which prohibits increases in rent without a certification that a dwelling is in "substantial compliance" with municipal housing regulations.

On November 15, 1976, the City of Orange enacted Ordinance MCD 27-76 "to regulate, control and stabilize rents and to create a Rent Control Board within the City of Orange * *."

---

[1]The other cases, also decided today, are *Dome Realty Inc. v. City of Paterson*, 83 *N.J.* 212 (1980), and *State v. C.I.B. International*, 83 *N.J.* 262 (1980).

The enactment codified and replaced the various ordinances regarding rent control which had been passed since 1972. It applied to all rented housing besides hotels, motels, one- and two-family dwellings and three-family, owner-occupied dwellings. The ordinance prohibited increases in rentals except under three sets of circumstances. When a lease expired or a periodic lease terminated, a landlord could charge an increase in rent proportionate to the increase in the Consumer Price Index[2] over the period of the former lease. Such periodic increases were originally limited to an annual rate of 4%.[3] A landlord could also petition for an increase to avoid economic hardship if he could not meet his "usual[,] customary and normal" operating expenses, including mortgage payments and maintenance costs. Finally, the ordinance permitted a landlord to seek additional rent for "major capital improvements or service [improvements]." An increase by reason of hardship or capital improvements was limited to 15% of a tenant's rent.

While no further official authorization was needed for periodic increases, each proposed increase in rentals due to hardship or capital improvements required the approval of the city's Rent Leveling Board. The board consisted of five members and two alternates appointed by the City Council for three-year terms. The ordinance granted the board authority to promulgate rules and regulations to implement the ordinance. Such regulations would "have the force of law." An aggrieved landlord or tenant could appeal decisions of the Rent Leveling Board to the City Council within 20 days of the date of determination.

The ordinance contains several provisions designed to insure a multiple dwelling's compliance with municipal standards for safety and habitability. When seeking a periodic increase in rents, a landlord must give formal notice to his tenants of the

---

[2]Specifically, the ordinance employed the Consumer Price Index of all items for the New York City metropolitan area, as compiled by the Bureau of Labor Statistics, United States Department of Labor.

[3]Amendments to the rent control ordinance raised that ceiling to 7% on September 7, 1979, and lowered it to 5% on November 9, 1979.

calculations involved in the increase, "and a certification that said dwelling and housing space is in *substantial compliance* with the applicable Property Maintenance Codes." Petitions for increases due to hardship or capital improvements required "a certification from the Property Maintenance Department of the City of Orange that the building and grounds are in Substantial Compliance with the Property Maintenance Code." The ordinance provided that the landlord must apply for official certification no more than one month prior to filing his petition with the Rent Leveling Board.

The ordinance defined "substantial compliance" as follows:
"Substantial Compliance" means that the housing space and dwelling are free from all heat, hot water, elevator and all health, safety and fire hazards as well as 90% qualitatively free of all other violations of the Orange Property Maintenance Code and the Property Maintenance Code of the State of New Jersey [4] where applicable. [footnote added]

As written, the definition appeared to mandate compliance with both the State and municipal housing codes. After the Appellate Division's decision in this case, however, the Rent Leveling Board issued regulations requiring substantial compliance with only the municipal housing code for the issuance of certificates.

Orange Taxpayers Council, Inc., a coalition of owners of rental properties in Orange, and several individual landlords [5] instituted this challenge to the rent control ordinance on March 10, 1977. Filing a verified complaint in lieu of prerogative writs, *R.* 4:69, plaintiffs named as defendants the City of Orange, its Rent Leveling Board, each of the board's members and its secretary,[6] the Orange Tenants Association, an unincorporated association of tenants residing in Orange, and Barbara Davis,

---

[4]This is undoubtedly a reference to the Regulations for Construction and Maintenance of Hotels and Multiple Dwellings promulgated by the State Department of Community Affairs, *N.J.A.C.* 5:10-1.1 *et seq.* See *N.J.S.A.* 55:13A-7, -8.

[5]The Terrace, Inc., Arthur Clay, Robert Magnus and Cora Magnus.

[6]The board members were Edward Ferrari, Marion Stewart, Kenneth Condon, Beverly Savage and Ralph Perrella. The board's secretary was Brenda Harrington.

the association's president.[7] Plaintiffs alleged numerous grounds for the invalidation of Orange's rent control scheme. Among them were challenges to the requirements that a landlord provide or obtain a certification of "substantial compliance" as a condition for any increase in rents.[8]

The parties filed cross motions for summary judgment on the legality of the certification scheme.[9] In a letter opinion the trial court held it invalid. According to the court, the requirement that an apartment be in "substantial compliance" with housing regulations was unrelated to the purposes of rent control. It found that the ordinance imposed penalties on landlords for violations of State as well as municipal housing regulations. Relying upon the Appellate Division decision in *Modular Concepts, Inc. v. South Brunswick Tp.*, 146 *N.J.Super.* 138 (App.Div. 1977), certif. den., 74 *N.J.* 262 (1977), the court held that the City of Orange did not possess authority to establish penalties for the violation of State regulations. Even as a measure designed to

[7]Also named as defendants were the 749 Scotland Road Tenants Association, an unincorporated association of tenants living at that address, George Weinstein, that association's president, and Stewart Klepach, a tenant residing at 749 Scotland Road.

Finding that these defendants had no substantial interest in the litigation, the trial court dismissed the complaint as to them on June 10, 1977. Plaintiffs have not sought review of this decision.

[8]Plaintiffs' other claims involved (1) the repeal of an earlier provision that allowed landlords to charge tenants for increases in municipal property taxes; (2) the alleged lack of fair representation of landlords' interests on the Rent Leveling Board; (3) the asserted absence of adequate standards in a provision permitting the Rent Leveling Board to reduce rents upon a failure to maintain a dwelling property; (4) the 15% ceiling on rental increases due to hardship or capital improvements; (5) the alleged provision of legal advice to tenants by the board's secretary; and (6) the furnishing by the board of legal representation to tenants in proceedings in which landlords sought rents in violation of the ordinance's guidelines. None of these challenges is presently before this Court.

[9]Plaintiffs also sought summary judgment regarding the repeal of the property tax surcharge to tenants; defendants moved for dismissal of the entire complaint.

enforce only local housing standards, the court ruled that the ordinance exceeded the limits of delegated municipal authority. By prohibiting increases in rent for dwellings that were not in "substantial compliance," the ordinance prescribed penalties for violations in excess of the $500 limit provided in *N.J.S.A.* 40:49–5. The court also noted that by requiring "substantial compliance" before permitting higher rents, the ordinance prevented landlords from seeking an increase to finance repairs for existing violations. Accordingly, the trial court granted judgment for plaintiffs.[10]

Defendants sought and were granted leave to appeal this decision to the Appellate Division.[11] Finding no facial defect in the certification requirement, the Appellate Division reversed the trial court. *Orange Taxpayers Council, Inc. v. City of Orange*, 169 *N.J.Super.* 288 (App.Div.1979). It held that Orange's scheme to insure the safety and habitability of rent-regulated dwellings was a reasonable exercise of municipal authority. Addressing the contention that compliance with housing regulations was not reasonably related to the purposes of rent control, the court observed, "Rent control would be self-defeating were landlords permitted to reduce maintenance expenditures and allow buildings to deteriorate because their profits have been regulated downward." *Id.* at 303.

The Appellate Division distinguished its earlier decision in *Modular Concepts, supra,* on three grounds. Although the South Brunswick ordinance in *Modular Concepts* required State, county and municipal approval of housing conditions, the court noted that Orange's ordinance required only municipal certifica-

---

[10]The trial court also held that the repeal of the property tax surcharge was arbitrary, capricious and contrary to the legislative policies expressed in the Tenants' Property Tax Rebate Act, *N.J.S.A.* 54:4–6.2 *et seq.* Finding insufficient evidence to evaluate the defendants' alleged furnishing of legal advice and representation, the court ordered a plenary hearing on the nature and extent of these activities. Plaintiffs' other challenges were dismissed.

[11]Also at defendants' request, the Appellate Division granted leave for a review of the trial court's ruling that the repeal of the property tax surcharge was invalid.

tion of "substantial compliance." Not only were the procedures in Orange less burdensome, but the detailed definition of "substantial compliance" and the availability of an appeal to the City Council were sources of protection from arbitrary treatment that were lacking in the South Brunswick ordinance. 169 *N.J. Super.* at 303. Concluding that the requirement of "substantial compliance" was on its face a reasonable exercise of municipal police power, the Appellate Division remanded the case to determine whether the ordinance was invalid in its application and whether plaintiffs had exhausted their administrative remedies before the Rent Leveling Board and the City Council. *Id.* at 304.[12]

We granted plaintiffs' petition for certification, but limited our review to whether a municipality could require the production of a certificate of "substantial compliance" as a prerequisite to an increase in controlled rents. 81 *N.J.* 399 (1979). As to that issue we now affirm.

■ The power of a municipality to control rents within its borders, in the absence of specific legislative authorization by the State, was recognized in the landmark case of *Inganamort v. Borough of Fort Lee*, 62 *N.J.* 521 (1973). Writing for the Court, Chief Justice Weintraub observed, "The police power is vested in local government to the very end that the right of property may be restrained when it ought to be because of sufficient local need." *Id.* at 538. The Court in *Inganamort* found that a shortage of rental housing and the consequent risk that landlords would exploit tenants presented a proper occasion for local government "to devise measures tailored to the local scene[,] * * * to meet varying conditions or to achieve the ultimate goal more effectively." *Id.* at 528. The "reservoir of police power" conferred by *N.J.S.A.* 40:48–2 was held to contain a

---

[12]The Appellate Division also ruled that the ordinance's repeal of prior provisions for property tax surcharges was facially constitutional and valid, and that the Tenants' Property Tax Rebate Act, *N.J.S.A.* 54:4–6.2 *et seq.*, did not prevent such a repeal. 169 *N.J.Super.* at 296–302, 304. We denied plaintiffs' petition for certification as to these issues; consequently we express no opinion on them.

delegation of legislative authority sufficient to support rent control by municipalities. See 62 *N.J.* at 536.

■ While *Inganamort* acknowledged the existence of municipal police power to regulate rents, the scope of that power remained largely unexplored until 1975. At that time, in a series of three decisions, *Hutton Park Gardens v. West Orange Town Council*, 68 *N.J.* 543 (1975); *Brunetti v. Borough of New Milford*, 68 *N.J.* 576 (1975); *Troy Hills Village v. Parsippany-Troy Hills Tp.*, 68 *N.J.* 604 (1975), the Court addressed various questions concerning the manner in which a municipality may exercise its police power to control rents. The fundamental principle enunciated in these decisions was that municipal rent control ordinances "are subject to the same narrow scope of review under principles of substantive due process as are other [forms of legislative price regulations]." *Hutton Park Gardens*, 68 *N.J.* at 563–564.

[W]here, in the opinion of the legislature, regulation of prices serves the public interest, a state is entirely free to impose such regulation, provided only that it does not employ means which are arbitrary, discriminatory or demonstrably irrelevant to a legitimate purpose. [*Id.* at 558]

■ Application of this principle led to a three-part analysis for assessing local rent control provisions. The first part is "whether the legislative body could rationally have concluded that the unrestrained operation of the competitive market was not in the public interest." *Id.* at 564. See *Troy Hills Village*, 68 *N.J.* at 616; *Brunetti*, 68 *N.J.* at 594; see also *Helmsley v. Borough of Fort Lee*, 78 *N.J.* 200, 209 (1978), app. dism., 440 *U.S.* 978, 99 S.Ct. 1782, 60 L.Ed.2d 237 (1979). The second inquiry is whether the regulatory scheme when examined in its entirety permits a "just and reasonable return" to the owners of rental properties. *Hutton Park Gardens*, 68 *N.J.* at 568–569; see *Troy Hills Village*, 68 *N.J.* at 619; *Brunetti*, 68 *N.J.* at 592; see also *Helmsley*, 78 *N.J.* at 210–211. Finally, the means adopted to accomplish regulation in the public interest must be rationally related to the purposes of the rent control ordinance. *Hutton Park Gardens*, 68 *N.J.* at 572–573; see *Helmsley*, 78 *N.J.* at 209.

■

■ When a plaintiff attacks a legislative enactment as simply arbitrary and unreasonable—a violation of his substantive due process rights—his claim is that he has been deprived of property for reasons unrelated to the welfare of the community. Judicial deference to the judgment of elected lawmakers requires that municipal rent control ordinances, like other legislative enactments, carry a presumption of validity. Although the presumption is not irrebuttable, it places a heavy burden upon the proponent of invalidity. See *Hutton Park Gardens*, 68 *N.J.* at 564–565. To succeed in his challenge, he must

> show that the legislative body could not have had any set of facts within its contemplation which would have permitted it to rationally conclude that the competitive rental housing market was not operating in the public interest. [*Troy Hills Village*, 68 *N.J.* at 616]

See, *e. g., Dome Realty, Inc. v. City of Paterson*, 83 *N.J.* 212, 235 (1980); *Moyant v. Borough of Paramus*, 30 *N.J.* 528, 534–535 (1959).

■ When confiscation is the issue, and the attack is upon the terms of the enactment itself and not the consequence of its application, the plaintiff's task is equally onerous. Only if a rent leveling ordinance is "so restrictive as to facially preclude any possibility of a just and reasonable return" may a court declare it invalid without considering the actual effects of the ordinance upon landlords. *Hutton Park Gardens*, 68 *N.J.* at 571; see *Brunetti*, 68 *N.J.* at 592.[13]

When these principles are applied to the case before us, it becomes clear that we must reject plaintiffs' claims. As their principal argument, plaintiffs challenge as arbitrary and unreasonable the requirement that an apartment be in "substantial compliance" with local housing regulations before a landlord can charge higher rents. Thus, they contend that the enforcement of minimum standards of safety and habitability is completely

---

, [13]When the *operation* of a rent control ordinance is challenged, "plaintiffs must show by clear and convincing evidence that the ordinance had a widespread confiscatory impact upon efficient landlords." *Helmsley*, 78 *N.J.* at 218; see *Hudson Circle Servicenter, Inc. v. Kearney*, 70 *N.J.* 289, 298–299 (1976); *Hutton Park Gardens*, 68 *N.J.* at 564–565.

unrelated to the goals of rent control. This proposition cannot be accepted.

We have ourselves described as "possible rationales for adopting [a rent control] ordinance * * * a housing shortage, widespread imposition of exorbitant rents, monopoly control of the rental housing market or *prevalence of substandard housing*." *Brunetti*, 68 *N.J.* at 594 (emphasis added). See *Hutton Park Gardens*, 68 *N.J.* at 564. Both "the problems of substandard dwellings and exorbitant rentals * * * stem from the critical condition of the housing market." *Inganamort v. Borough of Fort Lee*, 120 *N.J. Super.* 286, 310 (Law Div.1972), aff'd, 62 *N.J.* 521 (1973). No one would applaud the wisdom of lawmakers who by controlling the price of rental housing but not its quality, insured that their constituents could live in affordable dwellings that are unsafe, unsanitary and harmful to health. A municipality's authority to act "for the preservation of the public health, safety and welfare" of its residents, *N.J. S.A.* 40:48–2, permits it to go beyond mere regulation of price. There is no doubt that a municipality can employ its delegated police power to regulate the forces of the marketplace to help its residents obtain decent housing within their means.

■ This was precisely the goal of the City of Orange when it imposed a requirement of "substantial compliance" in its rent control ordinance. The preamble to the ordinance under scrutiny expressed official concern about both "increases in rents and subsequent deterioration of [residential] dwelling units." The same concerns were expressed in the city's original rent control ordinance in 1972. It appears that by enacting the "substantial compliance" requirement, the city could have acted—and indeed, did act—upon a rational perception of the "health, safety and welfare" of its citizens. We therefore find that the requirement is not an arbitrary and unreasonable feature of Orange's rent control ordinance.

Plaintiffs call attention to the procedures for obtaining a certification of "substantial compliance." Relying, as did the trial court, upon the Appellate Division decision in *Modular*

*Concepts, supra,* they argue that the burden the ordinance places on landlords seeking increases makes its observance completely impracticable. It is true that municipal ordinances "which are unworkable and impossible to comply with" may operate to deprive those affected of their property without due process of law. *Brunetti,* 68 *N.J.* at 599; see, e. g., *Kirsch Holding Co. v. Borough of Manasquan,* 59 *N.J.* 241, 251–252 (1971); *Kozesnik v. Montgomery Tp.,* 24 *N.J.* 154, 168 (1957). But plaintiffs have not shown that the procedures for obtaining an increase in rentals here present a patently unreasonable burden.

The regulatory scheme before the Appellate Division in *Modular Concepts, supra,* stands in stark contrast to the rent control ordinance promulgated by the City of Orange. The court in that case described the certification scheme before it as follows:

> The required proof of substantial compliance with state, county and local codes is not to be supplied by the landlord's certification of compliance; rather [the ordinance] requires "certificates from the appropriate agencies that there exists substantial compliance." [146 *N.J.Super.* at 146]

The court doubted that "such agencies can or will certify substantial compliance; at best what can be obtained will be a listing of any violations." *Id.* While the court in *Modular Concepts* did not so state, it must have been aware that the ordinance before it required at least three separate, official inspections of residential premises each time a landlord sought an increase in rents.[14]

The burden which the Orange ordinance imposes upon landlords is far less severe than that contemplated by the scheme in *Modular Concepts.* Under the procedures presently at issue, a landlord is not required to seek an inspection or official certification when he seeks a periodic increase. If he petitions the Rent

---

[14]It should also be noted that the Appellate Division in *Modular Concepts* based its decision to invalidate the rent control scheme on two additional premises: that the denial of rental increase constituted a "penalty," and that the maintenance of housing conditions is unrelated to the purposes of a rent leveling ordinance. See 146 *N.J.Super.* at 145–146. Today we reject both these propositions. See *supra* at 256–258; *infra* at 260–261; see also *Dome Realty,* 83 *N.J.* at 241–243.

Leveling Board for an increase by reason of hardship or capital improvements, he must obtain a certification from only one official agency—the city's Property Maintenance Department. Under current Rent Leveling Board regulations—which the ordinance provides "[shall] have the force of law," see *supra* at 250 the certification need cover only "substantial compliance" with the city's own Property Maintenance Code.[15] The burden of the Orange ordinance arise from a single inspection and from any delay in obtaining higher rents—what we have called "regulatory lag," see *In re Toms River Water Co.*, 82 *N.J.* 201, 203 (1980)—after a landlord requests an increase.

In the absence of any concrete allegations concerning instances when the certification procedure has in fact unreasonably burdened landlords, we reject plaintiffs' claim that the scheme inevitably denies landlords due process of law. Under the regulations of the Rent Leveling Board, any rent increases due to hardship or capital improvements shall be made retroactive to the date of certification of "substantial compliance." We have noted that constitutional principles of confiscation and procedural due process do not require this approach to "regulatory lag." See *In re Lambertville Water Co.*, 79 *N.J.* 449, 456 (1979). In addition to the protection of the landlord's economic interest afforded by retroactivity, there is also the Rent Leveling Board's express undertaking, contained in its regulations, to employ its "best efforts" to expedite inspections and certifications at a landlord's request. Without a showing that these safeguards become meaningless in their application, we find that the procedures of the Orange ordinance are not facially unworkable or unreasonable.

We dispose of plaintiffs' confiscation claims in a similar fashion. Once again our observation in *Hutton Park Gardens* is appropriate:

Plaintiffs in the present case have not tendered evidence as to their actual profits or losses, the value of their properties, the state of the housing market, or

---

[15]As we have noted, the use of a municipal housing code presents no inevitable conflict with State law, see *Dome Realty*, 83 *N.J.* at 233.

any of the other factors which a court would have to consider to determine whether the ordinances failed to permit a just and reasonable return. [68 *N.J.* at 571]

See *Dome Realty,* 83 *N.J.* at 236.

█ The only feature of the ordinance which on its face gives rise to a claim of confiscation is the requirement that a dwelling be in "substantial compliance" with housing regulations before the Rent Leveling Board grants an increase in rents for economic hardship or capital improvements. As the trial court noted, "[t]he landlord seeking an increase to cure violations by a capital improvement or hardship increase cannot even file the petition because such a landlord could not get the certificate." The effect of this requirement, however, is not the preclusion of "any possibility of a just and reasonable return," *Hutton Park Gardens,* 68 *N.J.* at 571. The purpose of requiring substantial compliance before granting an increase is to insure that tenants will not finance indirectly, by way of rent increases, those repairs which housing regulations and the landlord's implied warranty of habitability, see *Trentacost v. Brussel,* 82 *N.J.* 214 (1980), already obligate him to undertake. In the past we have recognized a tenant's right to receive reductions or rebates of rent when premises violate minimum standards of safety and health. See *Berzito v. Gambino,* 63 *N.J.* 460 (1973); see also *N.J.S.A.* 2A:42–85 *et seq.* Since the notion of a "just and reasonable return" embraces a landlord's responsibilities to his tenants as well as his right to receive sufficient income, we perceive no inherent defect in an ordinance that prevents increases in rent for defective premises.[16]

█ Finally, we address plaintiffs' claim that the prohibition of increases in rent for premises which are not in "substantial compliance" with housing regulations constitutes an illegal and excessive penalty. We discussed a closely related issue in *Dome*

---

[16]Although a cost of living increase may be rejected upon application of a tenant and the Board's finding that there was not substantial compliance, this provision does not preclude "any possibility of a just and reasonable return." *Hutton Park Gardens,* 68 *N.J.* at 571. The same is true regarding hardship increases.

*Realty,* 83 *N.J.* at 241–243. The ordinance in *Dome Realty* prevented the *rental* of a dwelling that was not in substantial compliance with local housing regulations—thus preventing a landlord from earning any income. See *id.* at 241–242. The ordinance presently before us prevents only the collection of *increased rental income*—in any case no more than 15% of existing rent. In both cases, the purpose of the prohibition is regulatory, not punitive. Paterson's ordinance in *Dome Realty* prevented the rental of defective premises to protect the "health and safety of * * * the general public in the municipality," *N.J.S.A.* 40:48–2.12a; *Dome Realty, id.* at 241–242. Orange's ordinance in the present case prevents existing tenants from being charged increased rents for premises that do not meet minimum standards for safety and habitability. Neither ordinance imposes "a sum paid or required to be paid by way of punishment for violation of law." *Zuest v. Ingra,* 134 *N.J.L.* 15, 18 (E & A 1946). The intent of both regulatory schemes is not to punish for past activity, but rather to insure that rental residential dwellings continue to conform to minimum standards of habitability. As in *Dome Realty,* "[t]his ordinance constitutes solely regulation the first instance; it exacts a fine only if the landlord [increases] rents [for] an apartment without obtaining a certificate * * *." *Dome Realty,* 83 *N.J.* at 242. We conclude that requiring substantial compliance with housing regulations before a landlord can obtain an increase in rents does not exact a "penalty" for noncompliance.

Based on their assertion that the prohibition of rent increases constitutes a "penalty," plaintiffs argue that its imposition, along with criminal penalties imposed directly for such violation, violates the Double Jeopardy Clause of the federal Constitution, *U.S.Const.,* Amend. V. Although such a challenge is undoubtedly premature in the absence of an actual second prosecution, we find the merits of this issue easily resolved. The Double Jeopardy Clause does not preclude the imposition of both a criminal and a civil, remedial sanction for the same act or omission. *One Lot Emerald Cut Stones v. United States,* 409 *U.S.* 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972). By protecting

tenants from rent increases for deteriorating premises, the Orange ordinance is a genuinely regulatory measure that does not invoke the constitutional guarantee against double jeopardy.

For the foregoing reasons, the judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For reversal*—none.