DORIC REALTY CO., PLAINTIFF, v. UNION CITY RENT LEVEL-ING BOARD, UNION CITY BOARD OF COMMISSIONERS, JANE DOE AND JOHN DOE, TENANTS OF THE DORIC APARTMENTS LOCATED AT 100 MANHATTAN AVENUE, UNION CITY, NEW JERSEY, AND DORIC APARTMENTS TENANTS ASSOCIATION, DEFENDANTS.

Superior Court of New Jersey
Law Division Hudson County

Decided December 4, 1981.

488

*George B. Campen* for plaintiff (*Farmer & Campen*, attorneys).

*Edward J. Lynch* for defendants Union City Rent Leveling Board and Union City Board of Commissioners.

*Thomas L. Curcio* for defendant Doric Apartments Tenants Association.

BILDER, J. S. C.

This is an action in lieu of prerogative writs to review the action of the Union City Rent Leveling Board (Board) in granting a 15% rent reduction based upon reduced services and maintenance. The landlord attacks the action procedurally as failing to follow the requirements of the ordinance and substantively as being unsupported in the record.

Section 12–10.5 of the Union City Rent Stabilization Ordinance reads as follows:

> *Rent Reduction Appeal; Decline in Care and Services.* Whenever services, care or maintenance decline in any dwelling, any tenant may apply to the rent stabilization board for a decrease or reduction in rent. True copy of such notice shall be served upon the landlord and all other tenants in such building simultaneously setting forth in detail the reasons for such application. At least one month shall elapse prior to the date fixed for hearing thereon.

Plaintiff is the owner of a 400-unit high-rise residential apartment at 100 Manhattan Avenue, Union City, known as the Doric. On January 6, 1981 tenants of Doric applied to the Board for a rent reduction due to alleged decreases in services and maintenance. There is no evidence that copies of the notice were served upon the landlord and other tenants, although a hearing set for January 7, 1981 (the day following the filing of the notice with the Board) was adjourned until January 21, 1981

to give the landlord an opportunity to obtain an attorney. It appears that the landlord's attorney examined the complaints on January 20, 1981. Although no transcript is available, it appears that the adjourned hearing was held on January 21, 1981, at which time a member of the Union City Fire Department testified as to building inspections he made and violations he noted, as, for example, tenant property being stored in electrical rooms. Apparently a report of the Bureau of Housing Inspection showing a November 20, 1980 inspection and follow-up examinations was also introduced and made part of the record. Whether this report was that of the Fire Department representative is unclear since it is unsigned and deals primarily with maintenance problems, such as loose bricks, leaks, needed painting and the like. It is an apartment-by-apartment listing of every violation of the Housing Code that could be found—listed quantitatively but not qualitatively; that is to say, one cannot tell from the November 20, 1980 report the magnitude of any particular violation. In addition, testimony was apparently taken from tenants with respect to lack of security, reduction of reasonable maintenance, landscape deterioration, inferior television reception, lack of a master key, late opening of the pool, lack of repairs, debris in hallways and incinerators and generally poor and inadequate maintenance. Despite the landlord's objection to the lack of notice required by the ordinance, the Board proceeded to make findings of marked deterioration of services and maintenance throughout the building and ordered a 15% reduction of rent effective April 1, 1981, retroactive to February 1, 1981, unless the violations were abated by March 15, 1981, such abatement to be determined by inspectors from the appropriate city departments. On March 13, 1981, finding less than 30% of the violations had been abated, the Board granted the rent reduction.

I

While the actions of the Rent Leveling Board are presumed to be correct and will withstand judicial interference in

the absence of a showing that they are arbitrary, capricious and unreasonable, *see In re Millburn Tp.,* 110 *N.J.Super.* 330, 335 (App.Div.1970), the determination must be capable of standing judicial review, *Application of Howard Savings Institution of Newark,* 32 *N.J.* 29, 52 (1960). Since the power of the Board derives from the ordinance, it is also axiomatic that the Board's actions must conform to the requirements of the mandate which is the source of its existence.

In the instant case, from a procedural point of view, the Board's action was defective in two fatal respects. In the first place, the Board failed to comply with those provisions of § 12–10.5 which are intended to insure that the landlord has proper notice and an opportunity to be heard—in other words, that the landlord receives due process. When the complaints were filed with the Board on January 6, 1981, notices should have been served upon the landlord and all of the tenants in the building setting forth in detail the reason for such application, and a date for hearing should have been fixed not sooner than one month later. The Board's failure to follow this procedure not only violated the provisions of the ordinance but unfairly impaired the ability of the landlord to meet the charges and obtain a fair hearing. In the second place, the Board failed to make a record such as would permit judicial review of its action. It is the contention of the landlord that the Board's action is unsupported by the evidence. It is impossible for a reviewing court to determine whether this claim does or does not have merit.

## II

While, as already noted, the record is insufficient to permit proper review, it is apparent from references which appear in the minutes that the Board has equated violations of the town's Building Code with reductions in service such as would justify a reduction in rent. Such a conclusion finds no justification in the ordinance. Although a rent leveling ordi-

nance may be used as a vehicle to maintain substantial compliance with municipal housing regulations, *Orange Taxpayers Council, Inc. v. Orange*, 83 *N.J.* 246, 257 (1980), it has not been so employed in § 12–10.5. Ordinances, like statutes, should be accorded their plain meaning, *see Service Armament Co. v. Hyland*, 70 *N.J.* 550, 556 (1976), and be interpreted so as to advance the legislative purpose. *See Newark v. Essex Cty.*, 160 *N.J.Super.* 105, 113 (App.Div.1978), aff'd 80 *N.J.* 143 (1979). Here it is clear that § 12–10.5 is intimately related to—and, indeed, a necessary corollary to—the rent control objectives of the ordinance. The section is designed to prevent landlords from effectuating a backdoor rent increase by decreasing services. If rent control is to be meaningful, it must be based on the notion that the landlord will continue to give the tenant the same space, accoutrements, service and benefits. Section 12–10 deals with increases where the imperatives of rent control require them, and corollary reductions where the objectives of rent control require them.

The ordinance requires that application for rent reduction be instituted by the tenant and contemplates specificity such as will permit other tenants to join (*ergo*, the notice to other tenants), the landlord to respond and the Board to make specific determinations as to the existence of a decrease in service such as would justify a decrease in rent and a quantification of that decrease which would ultimately result in an appropriate decrease or reduction in the rent.

While no cases have been found which define the kind of reduction in services which would justify a reduction in controlled rent, cases involving reduction of residential rent for breach of a covenant of habitability are instructive. *See Berzito v. Gambino*, 63 *N.J.* 460 (1973). Under the general principles set forth in *Marini v. Ireland*, 56 *N.J.* 130 (1970), rent reductions have been allowed for failures to furnish heat, hot water, elevator service and incineration, *Academy Spires, Inc. v. Brown*, 111 *N.J.Super.* 477 (Cty.D.Ct.1970), aff'd 108 *N.J.Super.* 395 (App.Div.1970), approved *Berzito v. Gambino, supra*; lack of

repairs, *Berzito, supra* ; poor maintenance rendering exterior patio and walkway unusable, *Timber Ridge Town House v. Dietz*, 133 *N.J.Super.* 577 (Law Div. 1975); lack of heat and hot water, dirty hallways, incinerator smoke in hallways and apartments, falling plaster, failure to paint apartments, water leaks in bathrooms and kitchens, flooding from a standby pipe in a hallway, broken windows and disrepair of a kitchen stove, *Newark Housing Auth. v. Scott*, 137 *N.J.Super.* 110 (App.Div. 1975); failure of air conditioning, *Park Hill Terrace Assocs. v. Glennon*, 146 *N.J.Super.* 271 (App.Div.1977), certif. den. 74 *N.J.* 250 (1977); absence of security, *see Trentacost v. Brussel*, 82 *N.J.* 214, 227 (1980). However, it is not every defect or failure which warrants or justifies a reduction; there must be a failure which has a serious and substantial relationship to the rental value.

> . . . if the alleged breach on the part of the landlord is proven, the tenant will be charged only with the reasonable rental value of the property in its imperfect condition during his period of occupancy. As a prerequisite to maintaining such a suit, the tenant must give the landlord positive and seasonable notice of the alleged defect, must request its correction and must allow the landlord a reasonable period of time to effect the repair or replacement. Not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability. The condition complained of must be such as truly to render the premises uninhabitable in the eyes of a reasonable person. [*Berzito v. Gambino, supra*, 63 *N.J.* at 469]

The lessons of the analogy would seem appropriate for application in the rent control context. With a focus on the purpose of the rent reduction—*i.e.*, to prevent a backdoor increase in rent by a decrease in services—it becomes apparent that the diminution of services, care or maintenance must be substantial and significant. There must be a true relationship between the landlord's alleged failures and the value of the rental. The decrease cannot be founded on trivial complaints or transitory failures. The Rent Control Board is not intended to be a forum for tenant gripes or personality conflict reprisals. Whether a defect is substantial or whether an interruption in services is transitory are questions of fact to be determined by the Board. Relevant to these issues are certainly the extent to which the landlord was responsible for the condition, the correc-

tive action, the duration of the condition and the effect of the condition on the value of the rented premises. The critical factor is a diminution of the rental value. *See Siegel v. National Bead and Stone Co.*, 37 *Misc.*2d 897, 901, 237 *N.Y.S.*2d 198, 202 (Cir.Ct.1963). Services and amenities furnished by landlords, like everything else in life, are subject to breakdown. As long as the breakdown does not result from the landlord's failure or neglect and there are timely and reasonable measures taken for repair, temporary interruptions are not the kinds of decreases in service which justify a rent decrease under the ordinance. Of course, an unreasonable delay or a permanent cessation of a service, even though without fault of the landlord, would mandate a rent decrease if significant to the value of the rental.

■ In reaching a determination the Board must make detailed findings of fact so as to identify and quantify the alleged defect and must make known the basis of its conclusion—*i.e.*, the standards it applied in relating the reduction in services to a reduction of rent. See discussion of the requirements of *quasi-judicial* administrative decisions, *Smith v. E.T.L. Enterprises*, 155 *N.J.Super.* 343, 348 (App.Div.1978).

The order granting a rent reduction is set aside and the matter remanded to the Rent Leveling Board for further action consistent with this opinion.