[No. A083297. First Dist., Div. Three. Aug. 2, 1999.]

GOLDEN GATEWAY CENTER, Plaintiff and Appellant, v.
SAN FRANCISCO RESIDENTIAL RENT STABILIZATION AND
ARBITRATION BOARD, Defendant and Respondent.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.D.

## COUNSEL

Browning, Wholey & Lenvin, Nancy C. Lenvin and Judith S. Mitchell for Plaintiff and Appellant.

Louise H. Renne, City Attorney, Marie Corlett Blits and Amy S. Ackerman, Deputy City Attorneys, for Defendant and Respondent.

## OPINION

**WALKER, J.**—In the published portion of this opinion we hold that a landlord who undertakes to perform reasonably necessary repair and maintenance work on rental property, which has the effect of temporarily interfering with or preventing the tenant's full use of housing services, but does not substantially interfere with the right to occupancy of the premises as a residence, does not effectuate a decrease in housing services within the meaning of the San Francisco rent control ordinance. Accordingly, we hold respondent San Francisco Residential Rent Stabilization and Arbitration Board (the Board) wrongfully found that appellant Golden Gateway Center (GGC) had substantially decreased housing services to its tenants by undertaking to maintain and repair outside decks on its apartment units. As a result of this finding, the Board granted several tenants' petitions for a reduction in rent to correspond with the alleged decrease in services. GGC challenged the Board's rulings by filing a petition for writ of administrative mandamus and a complaint for declaratory and injunctive relief. The trial court denied the writ on the basis that the Board's findings and determinations were consistent with applicable rent ordinances and the Board's rules and regulations. For the same reasons, the trial court also entered judgment for the Board on GGC's request for declaratory relief, with the additional holding that GGC's exclusive remedy was a writ of administrative mandamus. We reverse on the merits. In the unpublished portion of the decision, we affirm the denial of declaratory relief on the ground that GGC failed to present evidence on summary judgment to support its claim.[1]

## I. *Facts and Procedural Background*

GGC is the owner of an apartment complex in downtown San Francisco which includes four high-rise residential apartment towers. The complex contains approximately 1,200 rental units,[2] each with a private deck enclosed by an iron railing, accessible through a sliding glass door. For approximately four months in the spring and summer of 1993, GGC undertook to repair, waterproof and paint the concrete exterior of the buildings and decks, to

---

[1]GGC voluntarily dismissed its claim for injunctive relief, which is not at issue in this appeal.

[2]GGC's petition and complaint alleged the complex had 1,254 units, while the hearing officer's decision and the appellant's opening brief put the number at 1,196. The precise number of units is not germane to the issues presented on appeal.

replace all deck railings to correct potential safety problems, and to install new flooring on all deck surfaces. For the duration of the work, tenants were required to remove all items from the decks, and to refrain from using the decks during certain periods. Generally, the restriction on deck use was during weekday working hours, but on certain occasions, when the safety railings had been removed, tenants were completely prevented from using their decks for more than a week. Even when the tenants were permitted to use their decks, they could not do so in a normal manner because they were not permitted, for example, to use deck furniture or leave their plants out. In addition, the ventilation which they normally relied upon from opening the sliding doors was unavailable to them for much of the time work was being performed. As a result, certain tenants suffered discomfort from the heat and from unpleasant paint and food fumes.

Beginning in the fall of 1993, tenants began filing petitions with the Board, alleging that they had suffered decreases in housing services by virtue of the loss of full use and enjoyment of their decks and ventilation without a corresponding reduction in rent,[3] and asking the Board for an appropriate rent reduction. The petitions,[4] were consolidated for hearing and divided among three hearing officers. In July 1996, the hearing officers rendered their (virtually identical) decisions granting the petitions of those tenants who had complained that the loss of deck use constituted a substantial decrease in housing services, warranting a reduction in rent. Each of these 37 tenants was awarded a maximum rent reduction of $100 per month for each of the 4 months the decks were not fully usable.[5] GGC appealed the decisions to the Board, which denied the appeal, rendering the hearing officers' decisions final. GGC then filed its petition for writ of administrative mandamus in the superior court and its complaint for declaratory relief, both of which were denied. This appeal followed.

## II. *Standard of Review*

■ The facts underlying the hearing officers' decisions are essentially undisputed. We are called upon to interpret San Francisco's rent control ordinance and determine the manner in which it should be applied in this case. This is a question of law, to which we apply our independent determination. (*Mansell* v. *Board of Administration* (1994) 30 Cal.App.4th 539, 544 [35 Cal.Rptr.2d 574].)

---

[3]The petitions included many other claimed decreases in services, which were not upheld by the Board and which are not at issue on appeal.

[4]Approximately 95 in all according to the hearing officers' decisions.

[5]Some tenants had asked for less than $100 per month, and were awarded less.

## III. *Discussion*

### A. *Applicable Rent Control Ordinance Provisions*

In 1979, the San Francisco Board of Supervisors adopted a rent control ordinance for the City and County of San Francisco known as the Residential Rent Stabilization and Arbitration Ordinance (ordinance). The ordinance created the Board "in order to safeguard tenants from excessive rent increases and, at the same time, to assure landlords fair and adequate rents consistent with Federal Anti-Inflation Guidelines." (S.F. Admin. Code, § 37.1(b)(6).)[6] Section 37.2(q) of the ordinance defines rent increases as "[a]ny additional monies demanded or paid for rent . . . or any reduction in housing services without a corresponding reduction in monies demanded or paid for rent . . . ." "Housing services" are defined in section 37.2(g) as "[s]ervices provided by the landlord connected with the use or occupancy of a rental unit including, but not limited to, repairs, replacement, maintenance, painting, light, heat, water, elevator service, laundry facilities and privileges, janitor service, refuse removal, furnishings, telephone, parking and any other benefits, privileges or facilities." Finally, section 37.8(b)(2)(A) provides that tenants "may request arbitration hearings where a landlord has substantially decreased services without a corresponding reduction in rent and/or has failed to perform ordinary repair and maintenance under state or local law . . . ."

The Board has adopted rules and regulations for the administration of the ordinance. Rule 10.10(a) of the rules and regulations pertains to tenant petitions for arbitration and provides in part that "[a] tenant may petition for a reduction of base rent where a landlord, without a corresponding reduction in rent, has (1) substantially decreased housing services . . . or (2) failed to provide housing services reasonably expected under the circumstances . . . ."

### B. *The Hearing Officers' Findings*

The hearing officers made the following relevant findings: "The tenants who petitioned on the deck issue established that they suffered a substantial decrease in housing services during the time of the exterior painting and deck restoration, when the patio door was blocked off, the windows had to be kept fully or partially closed, and the deck was unavailable for normal use. Although the restoration work may have been necessary and may have preserved the building—ultimately innuring [*sic*] to the tenants' benefit—the

---

[6]Unless otherwise specified, all further section references are to the ordinance.

fact remains that the tenants were without full use of their patio door, windows, and deck. . . . The tenants paid for the full use of their ventilation capabilities and of the deck in their monthly rent; the lack of these services, therefore, should correspond to a reduction in the tenants' base rents during the time they could not use their doors, windows, and decks in the normal manner." The hearing officers found that the decks comprised a housing service within the meaning of the ordinance, and that the loss of normal deck use constituted a substantial decrease in housing services, warranting a reduction of base rent for a four-month period.

### C. *Appeal From Denial of Petition for Writ of Mandate*

#### 1. *Board's Application of Rent Reduction Provisions*

■ Appellant contends that in approving a rent reduction based upon the interruption in the tenants' use of the decks, the Board misinterpreted and misapplied the ordinance and its rules. GGC claims that by waterproofing and painting the exterior of the buildings and replacing potentially dangerous and defective deck railings, it was actually *providing* a housing service, not decreasing one, because these services are among those included in the ordinance's definition of housing services. Furthermore, contends appellant, by applying the ordinance as it did the Board acted inconsistently with other ordinance provisions and with the essential purpose of the rent control ordinance itself. Respondent disagrees, claiming that the ordinance and rules are clear on their face, thereby requiring no construction from us. It contends section 37.2(g) and rule 10.10(a) are clear in providing that rent may be reduced to offset a substantial decrease in housing services which, as GGC has conceded, includes use of the decks.

The issue presented is one of first impression in California. Each side has presented a case from another jurisdiction involving a similar rent control provision. Neither case is particularly helpful or persuasive in the matter before us, as neither involved the precise question presented here: Does interference with housing services resulting from reasonably necessary repair and maintenance to rental units, without a substantial impact upon the right to occupy the premises as a residence, represent a decrease in services justifying a corresponding reduction in rent under the ordinance? We hold that it does not.

GGC, for its part, urges us to embrace the reasoning in *Doric Realty Co.* v. *Union City Rent Bd.* (1981)·182 N.J.Super. 486 [442 A.2d 652] (*Doric*). *Doric* involved the court's review of a rent board's decision to grant tenants in Union City a reduction in rent because of decreases in services and

maintenance in their apartment building. The applicable Union City rent stabilization ordinance provided that " '[w]henever services, care or maintenance decline in any dwelling, any tenant may apply to the rent stabilization board for a decrease or reduction in rent.' " (*Id.* at p. 488 [442 A.2d at p. 653].) Because of an inadequate record, the court in *Doric* could not ultimately decide whether the rent reduction was appropriate. Nonetheless, in lengthy dictum it articulated its opinion as to how the ordinance should be applied, an interpretation urged by GGC here. Noting that ordinances must be accorded their plain meaning and be interpreted so as to advance the legislative purpose, the court stated: "[I]t is clear that [the rent reduction ordinance] is intimately related to—and, indeed, a necessary corollary to— the rent control objectives of the ordinance. The section is designed to prevent landlords from effectuating a backdoor rent increase by decreasing services." (*Id.* at p. 491 [442 A.2d at p. 654].) It further commented that "[s]ervices and amenities furnished by landlords, like everything else in life, are subject to breakdown. As long as the breakdown does not result from the landlord's failure or neglect and there are timely and reasonable measures taken for repair, temporary interruptions are not the kinds of decreases in service which justify a rent decrease under the ordinance. Of course, an unreasonable delay or a permanent cessation of a service, even though without fault of the landlord, would mandate a rent decrease if significant to the value of the rental." (*Id.* at p. 493 [442 A.2d at pp. 655-656].)

The Board urges us to follow *Interstate Gen.* v. *Dist. of Col. Rental* (D.C. 1985) 501 A.2d 1261, in which a landlord challenged the decision of the rental housing commission ordering a rent refund to tenants on the ground that a 45-day loss of air conditioning during the summer months constituted a substantial reduction in services. The District of Columbia Rental Housing Act allowed for a proportionate decrease in rent where it was determined that "the related services or related facilities supplied by a landlord for a housing accommodation or for any rental unit therein are substantially . . . decreased . . . ." (*Id.* at p. 1263.) In upholding the rent reduction the court rejected the landlord's argument that there must exist a component of willful neglect or affirmative wrongdoing on the part of the landlord to justify a decrease in rent. It held that the statute's plain meaning required only a finding that there had been "a substantial change in the services or facilities provided by the landlord. It does not require that the Rent Administrator look beyond the substantial change to ascertain whether an affirmative act by the landlord caused the change." (*Ibid.*) Because the evidence supported the finding that the tenants had been without air conditioning for 45 days in the summer months, the court upheld the rent reduction.

As noted, neither case is on point for the question we must consider. *Interstate* stands for a proposition which we do not consider here, but with

which we have no particular quarrel either: the rent reduction provisions do not require a showing that decreased services are the result of willful neglect or affirmative wrongdoing on the part of the landlord. The case did not involve a decrease in services caused by repair and maintenance, and so is of no help to us. *Doric* is of slightly more value, notwithstanding the fact that much of it is dictum and that it makes analogies to breaches in the warranty of habitability for its analysis, a matter not before us here. What is helpful in *Doric* is its consideration of the *policy* or scheme of the relevant statute or ordinance. Such inquiry is particularly called for in the matter before us because, contrary to the Board's assertion, the statutory language is not clear and unambiguous as applied to the facts before us. (*Stahl* v. *Wells Fargo Bank* (1998) 63 Cal.App.4th 396, 400-401 [73 Cal.Rptr.2d 667].) We seek to understand the legislation's purpose, and to construe it such that we avoid absurd or anomalous results. (*Looney* v. *Superior Court* (1993) 16 Cal.App.4th 521, 532 [20 Cal.Rptr.2d 182].)

Assuming as the parties do that use of the deck is a housing service, how are we to reconcile the tenant's right to continued deck use with its right to have repairs and maintenance on the rental unit? Both of these items fall within the housing services which must be maintained at an uninterrupted level, lest the landlord be exposed to a rent reduction order. Nothing in the ordinance itself indicates a legislative preference for one type of housing service over another. By considering the overall purpose of the rent control ordinance, however, we conclude that the ordinance was not intended to be applied as it was by the Board.

San Francisco's rent control ordinance, first adopted in 1979, was necessitated by what the board of supervisors perceived as a housing crisis in the City and County of San Francisco. The crisis was caused by uncontrolled rent increases which had the effect of either displacing tenants who could not pay increased rents or forcing tenants to expend less on other of life's necessities in order to pay increased rents. (§ 37.1(b); *Fox* v. *San Francisco Residential Rent etc. Bd.* (1985) 169 Cal.App.3d 651, 654 [215 Cal.Rptr. 565] [rent control ordinance enacted especially to address tenant hardships and housing shortage].) The essential purpose of the ordinance was to regulate rents, so that tenants would not be subjected to excessive rent increases. As a safeguard against furtive tactics, the ordinance defined rent increases to include not only additional amounts requested for rent, but also "any reduction in housing services without a corresponding reduction in the monies demanded or paid for rent[.]" (§ 37.2(o).) In other words, the ordinance was designed to control both "front door" and "back door" rent increases. Thus, when a service that had been provided as part of the tenant's

rental package ceased to be provided, the tenant could not reasonably be expected to continue paying the same rent. In the present case, a housing service did not *cease* to be provided; rather, by undertaking to *provide* housing services—repair, maintenance and paint—another service was temporarily interrupted. It would be unworkable and unreasonable to apply the ordinance to such a situation. The ordinance contemplates that landlords will provide repair and maintenance services, which by necessity will at times inconvenience the tenants. We hold that this unavoidable type of inconvenience, which may interfere with housing services but which does not substantially interfere with the right to occupy the premises as a residence, does not entitle a tenant to a reduction in rent.[7]

In seeking to justify its application of the rent reduction provision to GGC's conduct, respondent Board makes an additional argument which it contends harmonizes the ordinance with the Board's actions. Section 37.7(a) provides that "hearing officers shall have the authority to conduct hearings in order to certify rental increases to the extent necessary to amortize the cost of capital improvement, rehabilitation, and energy conservation measures. Costs determined to be attributable to such work shall be amortized over a period which is fair and reasonable for the type and the extent of the work and which will provide an incentive to landlords to maintain, improve and renovate their properties while at the same time protecting tenants from excessive rent increases. Costs attributable to routine repair and maintenance shall not be certified." Pursuant to this section, GGC filed a petition with the Board to certify the $2,672,536 cost for the painting and deck work and to raise tenants' rents according to the Board's rules. The Board approved a capital improvement rent increase in the amount of $37.12 per month for each affected unit.

The Board contends, essentially, that by allowing the landlord to recoup the costs of capital improvements by pass-through to the tenants, while simultaneously reducing the rents the landlord collects from the tenants because of the inconvenience they suffer from the capital improvement, everyone comes out even. This may be the case, but nowhere is it written that the purpose of the ordinance is to ensure that everyone will come out even. In fact, there is no logical or legal basis for placing these two provisions into the same equation. The capital improvement provision is intended to encourage landlords to maintain their properties by allowing them to recoup the cost of their capital investment; the rent reduction

---

[7]There is no allegation or evidence in the record that the deck work was carried out in an unreasonable manner or that it took too long. We do not consider the effect such evidence would have on a tenant's claim for reduced rent.

provision is intended to prevent landlords from reducing services as a way of increasing rents. If landlords who make capital improvements can count on having their recouped costs eviscerated by a rent reduction, where lies the incentive referred to in the ordinance? The granting of the pass-through has nothing to do with the question before us and does not change our holding.

### 2. *Constitutional Challenges*

GGC has raised several constitutional challenges to the ordinance as it was applied to it. It contends that the Board's ruling was arbitrary and capricious, in violation of GGC's due process rights guaranteed by the California and United States Constitutions, that it was unconstitutional in that it failed to further legitimate state policy, and that it constituted an unlawful taking without just compensation. Because we have held that the Board's decision was an incorrect application of the ordinance, we need not reach these constitutional issues.

### D. *Appeal From Denial of Declaratory Relief\**

. . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. *Conclusion and Disposition*

We hold that a landlord who undertakes to perform reasonably necessary repair and maintenance work on rental property, which has the effect of temporarily interfering with or preventing the tenant's full use of housing services, but does not substantially interfere with the right to occupancy of the premises as a residence, does not effectuate a decrease in housing services within the meaning of the San Francisco rent control ordinances. Accordingly, we reverse the trial court's denial of GGC's petition for writ of mandate seeking to overturn the Board's decision ordering a reduction in the petitioning tenants' rent. We affirm, however, the trial court's denial of GGC's claim for declaratory relief, as it failed to present evidence to support its claim. The matter is remanded for further proceedings. GGC shall recover its costs on appeal.

McGuiness, P. J., and Parrilli, J., concurred.

---

*See footnote *ante*, page 1204.